CITY OF COLUMBIA *ET AL.* v. MONTEITH *ET AL.*

(137 S. E., 727)

1. WILLS—OBJECT OF ALL CONSTRUCTION IS TO ASCERTAIN TESTATOR'S INTENT.—The object of all construction of wills is to ascertain the intention of the testator.

2. CHARITIES—EQUITY CANNOT DEVOTE ANY PORTION OF FUND, DEDICATED TO CHARITABLE USE, TO OBJECT NOT CONTEMPLATED BY DONOR. —Courts of Equity cannot devote any portion of a fund, dedicated to a charitable use, to any object not contemplated by the donor.

3. CHARITIES—USE OF PROCEEDS OF FUND, CREATED FOR SUPPORT OF SCHOOL FOR POOR CHILDREN, IN AID OF PUBLIC SCHOOLS WOULD BE PERVERSION THEREOF.—Where a devise creates a fund for the use and support of a school or institution for the benefit of poor children in a named town, permanent appropriation of the proceeds of such fund to the aid of the public schools of that town, use' of which would lighten taxes assessed on property of the town, would be a perversion of the fund from the legitimate object of the donation.

4. CHARITIES—WHERE WILL DEVISED PROPERTY FOR INDUSTRIAL SCHOOL FOR CHILDREN OF INDIGENT WHITE PERSONS FOR TRAINING FOR DOMESTIC SERVICE, USE OF PROPERTY IN AID OF PUBLIC SCHOOLS WAS UNAUTHORIZED.—Where will devised residence and grounds attached to city to be kept as an "industrial school for the children of indigent white persons * * * wherein the children shall be trained for domestic service, thereby enabling them to gain an honest livelihood," city could not use the property in aid of the public schools without violating the trust created.

5. CHARITIES—TRUST, CREATED BY DEVISE OF PROPERTY FOR USE AS INDUSTRIAL SCHOOL FOR CHILDREN OF INDIGENT WHITE PERSONS, HELD INVALID FOR INDEFINITENESS, UNCERTAINTY, IMPRACTICABILITY, AND WANT OF PROVISION FOR CARRYING OUT.—Trust, created by will, devising residence and grounds to city to be kept ·as an industrial school for the children of indigent white persons, where such children should be trained for domestic service, *held* invalid as indefinite, uncertain, impracticable, and without provision for carrying it out.

6. CHARITIES—IMPOSSIBILITY OF USING TRUST PROPERTY AS DIRECTED DOES NOT EMPOWER COURTS TO CHANGE BENEFICIARIES OF CHARITABLE TRUST.—Impossibility of using trust property in the manner desired by testatrix does not confer on the Courts the power to change the beneficiaries of a charitable trust.

Before FEATHERSTONE, J., Richland, Spring term, 1925. Reversed.

Action by the City of Columbia and. another against C. S. Monteith, as administrator *de bonis non, cum testamento annexo* of the estate of Eliza Berrien Carroll, deceased, and others. From a decree for plaintiff, defendants Margaret C. Yawn and Louise B. Kendall, appeal. Reversed.

The decree of Judge Featherstone here follows:

The questions in the case turn upon the construction of the trust clause in the will of Elizabeth B. Carroll, widow

of the late Chancellor Carroll, who died in the city of Columbia in 1893, seized in fee and possessed of a very valuable lot in said city, worth from forty to fifty thousand dollars, and bonds and other securities now worth around $7,500.00.

The will bears date July 9, 1890, and is in the handwriting of Col. Joseph Daniel Pope, a lawyer of great ability and learning, who for a long time was at the head of the Law School in the University of South Carolina.

The testatrix created several life estates, upon the falling in of which, she devised the property in fee to her grandson, Edward Screven, upon condition that he change his name to Carroll, which he refused to do.

The life estates have terminated and it is conceded that the property passes under the trust clause, unless it fails because it is too indefinite and uncertain, or, owing to changed conditions, it cannot be carried out.

The City of Columbia accepted the trust and desires to carry it out through the public schools of the city, and to this end passed the following resolution:

"At a meeting of the city council of the city of Columbia, held this 3rd day of August, A. D. 1923, the following resolution was unanimously adopted:

"Whereas, by the will of Eliza Berrien Carroll, which is on file in the office of the Judge of Probate for Richland County, S. C., certain property consisting of real estate located in the city of Columbia, S. C., and some personal property was devised to the city of Columbia for the purpose of conducting an industrial school, as stated in the said will, the said property to become the property of the city of Columbia, upon the death of Miss Sophia Carroll, the daughter of the testatrix; and,

"Whereas, Miss Sophia Carroll recently died in the city of Columbia, S. C.; and,

"Whereas, the school system of the city of Columbia is in charge of and under the direction of the board of school commissioners for the city of Columbia:

"Now, therefore, be it resolved, that the city of Columbia accept the bequest of the said Elizabeth Berrien Carroll, and that the said property be turned over to the board of school commissioners for the city of Columbia, S. C., to be used as a part of the school system of said city in accordance with the terms of said will.

> "W. A. Coleman,
> "S. L. Sweeney,
> "F. D. Marshall,
> "M. B. Du Pre."

The defendants, other than C. S. Monteith, the administrator *de bonis non*, with the will annexed, of Mrs. Carroll, are those who would take the property in the event of the failure of the trust—by reversion.

The defendant Margaret C. Yawn claims under the residuary clause of the will, she alleging that the title to the property never passed out of Mrs. Carroll.

The administrator answers, admitting the allegations of the complaint, alleging that he has in his hands securities of the value of about $7,500.00, which he is ready to turn over to whomsoever the Court may direct; and asking that he be allowed attorney's fees.

The defendant, Louise B. Kendall, alleges that she is the sole heir at law of the testatrix, and that Eliza A. Carroll, Mary Screven, Edward Screven, and Sophia E. Carroll are all dead. She further alleges that the proposed plan is not a carrying out of the trust. She prays that the City of Columbia proceed to carry out the trust, seemingly admitting that it can be carried out though not under the proposed plan.

The material facts are undisputed, and the questions to be considered are of law.

Some testimony was taken in open Court relating to the carrying out of the proposed plan, which will have to be considered in connection herewith.

The resolution passed by the trustees is as follows:

"Resolution adopted by the School Board.

"*Resolved,* That the Carroll house and lot be used as a unit of the City Schools, to be known as the Carroll Memorial School, and in which there shall be taught courses embracing industrial training and domestic science.

"*Resolved, further,* That the superintendent take steps at once looking forward to the opening of the unit in September, 1925, or as soon thereafter as practicable reporting to the board or as soon as practicable what changes and improvement in the dwelling are necessary to adapt it to school purposes.

"*Resolved, further,* That architects be invited to submit sketches of buildings for the development of that property with the understanding, however, that this board will incur no obligation for the payment of such sketches except to the one who may be awarded the contract and in which the general compensation for services will embrace the compensation for the preliminary sketches."

The trust clause in the will is as follows:

"I give and devise the said residence and the grounds thereunto attached to the City of Columbia in the State of South Carolina, to be known by the name of the 'Carroll Memorial Orphanage,' in which there shall be kept an industrial school for the children of indigent white persons living in or near the City of Columbia wherein the children shall be trained for domestic service, thus enabling them to gain an honest livelihood or support for themselves, and be efficient and useful when so employed in families."

The three questions for determination are:

First, is the trust so indefinite and uncertain that it cannot be enforced?

Second, if it is not, if the trust is good, what interest have those who claim by way of reversion in the controversy?

Third, if the trust is good, is the plan proposed by the trustees permissible, will it be sanctioned by the Court?

The trust, beyond doubt, is charitable in its nature, and, in determining whether or not it is good, it must be borne in mind that it belongs to a class which is highly favored by the Courts. Therefore, in discussing the first question, we should do so in the light of certain well-defined, equitable principles which are elementary and recognized by all the Courts.

In 5 R. C. L., pages 89, 90, we find the following statement:

"Legacies or devises to the uses of charity are entitled to peculiar favor and are regarded as privileged testaments, and will not be declared void if they can by any possibility, consistent with law, be considered as good. So Courts of Equity go to the length of their judicial power rather than that such a trust should fail. They are construed to give them effect if possible, and to carry out the general intention of the donor, even if the particular form and manner pointed out by him cannot be followed."

In *Ould v. Washington Hospital,* 95 U. S., page 303; 24 L. Ed., 450, the rule is stated as follows:

"Charitable uses are favorites with Courts of Equity. The construction of all instruments where they are concerned is liberal in their behalf."

In *Russell v. Allen,* 107 U. S., 163; 2 S. Ct., 327; 27 L. Ed., 397:

Such "instruments * * * should be so construed as to give them effect if possible, and to carry out the general intention of the donor, when clearly manifested, even if the particular form or manner pointed out by him cannot be followed."

Tested by this rule, is the trust so indefinite, vague, or uncertain that it cannot be enforced?

(1) The property given is certain.   (2) The beneficiaries are certain, or can be made certain.   (3, The trust is certain.   (4) The main purpose of the trust is certain.

Upon its face, therefore, the trust is good and can be enforced.   This being true, it follows that those who seek to claim, whether as residuary devisees or heirs at law of the donor, can have no possible interest in the property.

The title passed from the donor to the trustees, and nothing was left for them to take.   Nor have such persons any possible interest in the controversy.

In *Brigham v. Peter Bent,* 134 F., 513; 67 C. C. A., 393, it was held:

"Where property has been lawfully disposed of for charitable uses by a will, the heirs of the testator have no standing in equity, to question the powers or title of the devisee or of intervening executors or trustees."

If this reasoning be sound, then the first question must be answered in the negative, and the second is answered by holding that the persons claiming by way of reversion have no interest in the property, nor in this controversy, in so far as the trust appears upon its face.

We, therefore, go to the third question, which is the crux of the case.

Is the proposed plan a carrying out of the trust, or is it a perversion thereof?

To aid us in answering this question, we must again seek light from certain well-defined principles of equity, as illustrated by the decisions.

We must bear in mind again that such trusts are "entitled to peculiar favor"; that "they are construed to give them effect if possible and carry out the *general* intention of the donor—even if the *particular form and manner* pointed out by him cannot be followed." (Italics supplied.)

Judge Woods, in *Mars·v. Gibert* (The De la Howe Will Case), 93 S. C., 466; 77 S. E., 135, said:

"It does not result, however, that the details of the plan laid down in the will must be followed to the letter. The *main purpose* being kept in view, considerable flexibility will always be allowed in the details of the execution of a trust, *so as to adapt it to the changed conditions.*" (Italics supplied.)

What are the facts in that case? There the donor had in mind the training of certain poor boys and girls, not as college men and women, but in the beginning of school life.

Owing to changed conditions, the school could not be operated by itself; the Legislature authorized the establishment of scholarships in Clemson and Winthrop in lieu thereof. The Court held that such plan was not a carrying out of the trust. Why? Because the main purpose of the donor would be defeated, to wit, the training in colleges instead of in common school, and at a place different from the place contemplated by the donor.

But did the trust fail for those reasons? Not at all, but the Court said:

"It may not be practicable to conduct such a school at the precise place in the community designated by the will. That is not essential to the main purpose of the trust. It may not be possible to make such a school successful except when conducted in conjunction with the public school of the neighborhood, but that is no objection. It is true that the trustees of the De la Howe School could not surrender their trust to the control of the public school trustees, but they could elect the superintendent and teachers of the public school head master and teachers of the De la Howe School, and the two institutions could thus be conducted in conjunction to the benefit of the community."

It is true that the *cy pres* doctrine was expressly repudiated in that case, but, notwithstanding that the trust was

sustained, and the Court, taking a broad liberal view, carried out the main purpose of the donor, although changed conditions made it necessary to vary the details and apply considerable flexibility to the manner of the execution.

In the instant case, those who seek to destroy the trust and reap a benefit never intended by the donor say the contemplated plan will not be a carrying out of the main purpose of the donor, for several reasons:

First, they contend that, on account of changed conditions, there are, within the designated territory, no children of indigent parents who desire to be trained in an "industrial school" for "domestic service," and, therefore, a school run along such lines would necessarily prove a failure.

They seek, in the opinion of the Court, to give to the language employed by the donor a meaning which is entirely too narrow and restricted. In their view, the children are to be trained only for "domestic service," to the end that they may be employed in families as domestic servants.

Concede, for the moment, that such narrow construction is the correct one, and what would be the result?

Can the Court, by way of surmise, say that there are no poor children in that territory who would wish to avail themselves of the bounty of the testatrix? See *Taylor a. University,* 226 U. S., 126; 33 S. Ct., 73; 57 L. Ed., 155.

The plan has never been tested. "The proof of the pudding is in the eating thereof." And it is asking a great deal of the Court to request it to assume that within all of the territory mentioned there are not some poor white children who are willing to engage in such work, and who would like to better prepare themselves for their life work.

Experience has demonstrated that a school of most any kind, teaching upon most any subject, will always find those who desire to enter there and thus better their condition.

It may be true that only a few would enter such school, but even if such few only would be reached and benefitted that would be sufficient to prevent a failure of the trust.

The Court of Equity will always see to it that the trustee makes an honest effort to carry out and perform the trust. And that the trust will never be declared a failure until it has been demonstrated beyond doubt that it cannot be executed. See 226 U. S., 126; 33 S. Ct., 73; 57 L. Ed., 155, *supra.*

We have in this State a case which is regarded as a leading case in the United States upon this subject. It is the case of *Dye v. Beaver Creek Church,* 48 S. C., 444; 26 S. E., 717, also reported in 59 Am. St. Rep., 724, with annotations. In that case the Court, speaking through Chief Justice Gary, laid down the following general rules as applicable to charitable trusts:

"(1) If a trustee is appointed by the testator, and the will shows that the object of the devise, though expressed in general terms, is for a charitable use, the trust will be declared valid. * * * (2) If a trustee is not appointed by the testator, and the will does not declare the manner in which the devise is to be made effectual, equity will not administer the trust. The reason a trustee is allowed to enforce a trust, the object of which is only expressed in general terms, is that in exercising his discretion he carries out the intention of the testator. But when there is no trustee appointed to exercise this discretion in devising a scheme for the execution of the trust, the Court of Equity can look alone to the will, and if it does not show the intention of the testator, parol testimony is inadmissible, and the trust must fail."

*In re John's Estate,* 30 Or., 529; 47 P., 353; 36 L. R. A., 253, we find the following:

"The manner of administering the trust is of secondary importance. He has indicated a method for its application, but it is not within the ken of human ingenuity to devise

a plan that may be observed in every particular in its execution; so that, if his particular method of administration should fail in some particular, that would not give reason for voiding the trust."

To repeat, it has not been made to appear that the trust in the case under consideration cannot be carried out. If it can be carried out, it is the duty of the trustee to execute it. If the trustee, in whom is the legal title, will not carry it out, the Court will appoint a new trustee and direct him so to do, for it is axiomatic that a Court of Equity will never lack for a trustee. The trust will not fail and the property revert so long as it can be carried out by the present trustee, or a new one appointed by the Court for that purpose.

The foregoing discussion has been based upon the idea that, even if the language of the donor be given the narrow construction contended for, yet the trust is good—certainly, at this stage, it cannot be assumed by the Court that it will fail. But, in the opinion of the Court, the language employed ought not to be given such a narrow and restricted interpretation.

We must assume that the testatrix did not mean to do a foolish and vain thing; that the learned lawyer who drafted the will had in mind that the Court, in construing the language, would not give it a narrow meaning, but would take into consideration the main purpose which the donor had in mind and seek to carry it out in a broad, liberal way.

In construing a will, the Court seeks to get at the intention of the testator, and, when that is ascertained, it will be carried out without too much hairsplitting or refining. With this end in view, let's look at the language employed:

First, it may be assumed that Mrs. Carroll wanted to perpetuate the Carroll name.

Second, it may be concluded that she wanted to establish an "industrial school." That's what she said.

Third, the school was to be established for the children of indigent white people.

Fourth, in that school ("industrial") the children should be trained for "domestic service."

Fifth, to what end? Let the will speak: "Thus enabling them to gain an honest livelihood, or support for themselves, and be efficient and useful when so employed in families."

Giving the language a broad, liberal interpretation, what did she mean? Could she have meant the children trained in an "industrial" school should be confined solely to menial service as servants in families? To ask the question is to have it answered in the negative—and this without reference to the context.

Further, she says that the children, when thus trained in an "industrial" school, for "domestic service," were to get such training to enable them to make an honest living or support for *themselves* (italics supplied), and be efficient and useful *when* employed in families.

Mark you, the word "servants" does not appear in the will.

*In re Donges,* 103 Wis., 497; 79 N. W., 786; 74 Am. St. Rep., 885, we find the following:

"Where the language used in a will is reasonably susceptible of two different constructions, one of which will defeat, and the other sustain, the provisions, the doubt is to be resolved in favor of the construction which will give effect to the will, rather than the one which will defeat it."

Looking at the language from the standpoint of reason and common sense, it is almost inconceivable that the donor meant that the children were to be exclusively trained for positions as servants in families, and that was the only benefit that they were to receive from training in an "industrial school."

To test this view, let's find out the definition of the words employed.

What is the meaning of "domestic"? As an adjective:

"Belonging to the house, or household; of a house, home or family; relating to home life, as, domestic concerns, life, duty, happiness." 19 C. J., 387.

In *Henderson v. Shreveport Gas, E., L. & P. Co.*, 134 La., 43; 63 So., 618; 51 L. R. A. (N. S.), 451, we find the following:

" 'Domestic' is defined by Webster to be: 'Of or pertaining to one's house or home, or one's household or family; relating to home life; as domestic concerns, life, duty, happiness, worship, service.' * * * The word 'domestic,' therefore, excludes the idea of business."

In *Dayton v. Ewart*, 28 Mont., 156; 72 P., 422; 98 Am. St. Rep., 551, we find the following:

"Nor do the words, 'personal services rendered,' necessarily contemplate that the services be rendered another. They may, in proper cases, mean the services which one renders to himself. The word 'service' has different meanings. It may mean 'an advantage conferred; that which promotes interest or happiness; benefit.' "

Mr. Webster, in defining "domestic" as an adjective, says it means:

"Of or pertaining to one's house or home, or one's household or family; relating to home life; as domestic concerns, life, duties, cares, happiness, worship. Devoted to home duties or pleasures."

When used as a noun, he says it means: "A house servant." He then defines service as, first, "Occupation of servant." He defines service in a broader, more liberal way as: "Useful office; advantage conferred; that which promotes interest or happiness."

What is the meaning of "industrial"? In 31 C. J., 960, it is defined as follows:

"A very large word; consisting in or pertaining to industry, relating to industry. The term is also often employed as referring to something relating to manufactures, or to the product of industry or labor."

With these definitions in mind, it looks as though the learned lawyer who drew the will meant to provide that the children of indigent parents were to be trained in the business world, as evidenced by the use of "industrial," as applied to schools. Next, that in employing the word "domestic," not as a noun, but as an adjective, he meant that they were to be trained in matters relating to home life, "duty, happiness, worship, service." And he used "industrial" in connection with "domestic service" for the reason that domestic education would have left them without business training. He wanted an all round training which would fit them for any kind of life. He did not use the word "domestic" as a noun, for that would have meant servant, but used it as an adjective, describing the kind of service which he had reference to.

The will was made in 1890, and since that time little, if any, change has taken place in the South with reference to white servants engaged in menial family service. But it is a fact which the Court will take notice, that since that time there has sprung up the idea of the importance of industrial training, and training for domestic service, and that in all the up-to-date schools those departments are being emphasized as never before. It may be that the testatrix was among the first to catch the vision and appreciate the need for special training along those lines. It may be also that, as early as 1890, she saw that the tendency was to too great an extent for the young people to drift away from home life; and she desired such training given to the children as would make them love home life more, which she knew was conducive to happiness and essential to good citizenship. Her intentions may be epitomized as follows: "I want the children trained in the business world (industrially), given a practical education so that they may take care of themselves. Next I realize that the tendency nowadays is not to appreciate and enjoy the home like it ought

to be enjoyed; that there is a drifting away from home (domestic) life, which is essential to true happiness and necessary to good citizenship. Therefore, I want their training along that line emphasized. I want them to know that 'service' is that 'which promotes interest or happiness.' " Every housewife, if she do her duty, is engaged in "domestic service," but she is in no sense a servant.

When we bear in mind the main purpose of the donor, it must be concluded that the plan proposed by the trustee for the carrying out of the trust is not opposed thereto; that it does not require the application of the doctrine of *cy pres* to sustain it, but that it is a substantial compliance with the wishes of the donor.

Some of the specific objections urged against the proposed plan will now be considered:

It is urged that, inasmuch as the City of Columbia is made the trustee, to permit the trustees of the city schools to operate and supervise the Carroll School is fatal to the plan.

There would be some force in this contention if the title to the property had been changed; but such is not the case; it is to remain where the donor put it—in the City of Columbia. Under the plan, the city, which necessarily must act through some agent or agents, is only appointing the trustees to carry out the trust on its behalf.

The school trustees are elected, four by the people of Columbia, one by the City Council, and the others from some other source—seven in all. It is true that the school district of the City of Columbia is a separate and distinct corporation, made so in order that bonds may be issued and for other purposes of convenience. But it serves the same territory, for school purposes, and is in fact the City of Columbia.

Section 1 of the Act creating the school district of the City of Columbia, provides:

"That for the purpose of maintaining public schools in the City of Columbia and promoting their efficiency, the area embraced in the corporate limits of the City of Columbia is hereby declared to be a new school district, to be known as the School District of the City of Columbia."

Under *Mars v. Gibert, supra,* it is competent to combine the Carroll School with the public schools, and the two institutions can thus be operated in conjunction. It will be necessary, however, following *Mars v. Gibert,* for the City to elect the superintendent and teachers of the public schools, as its agents to carry out the trust, if it has not already done so by the resolution. And the city must not surrender its trust in reference thereto. All of these are matters of detail which can be easily worked out, and *Mars v. Gibert* is authority for so holding. It may be, however, that the donor, in making the City of Columbia her trustee, did not refer to it as a corporation, as a distinct and separate entity, but to the city as organized for school purposes. But be that as it may, the fact that the city is using the school trustees as an agency will not vitiate or destroy the trust.

Again, it is urged that the plan is in contravention of the trust because under the plan the schools now only serve the children within the City of Columbia limits.

The trust does require that the school shall be open, not only to those in, but to those near the city. It is, therefore, necessary that this difficulty should be eliminated, and the Court is assured that it will be, and that arrangements will be made to that effect.

It is also contended that the proposed plan cannot amount to carrying out of the trust for the reason that in the public schools education is supplied to the rich as well as the poor, whereas the donor intended that, under her trust, only the poor should have it.

It is inconceivable that this should be considered a real objection. If the poor children provided for in the trust get their share, what matters it that those who are able to

pay should share also? Surely, if the spring of learning is sufficient to satisfy the thirst of the indigent, it should not be objected that the rich drink from the same source. The objection is fully met by *Mars v. Gibert* and nothing else need be said.

In addition to all the foregoing, it is contended that the will provided that the school shall be called the "Carroll Memorial Orphanage," and that the language employed means that it should be operated exclusively as an orphanage, and that only those housed therein shall receive the training provided for.

Taking the language as a whole, and having in mind the main purpose of the testatrix, this view should not prevail. The donor said, "There shall be kept an industrial school for the children of indigent white persons *living* (italics supplied) in or near the City of Columbia," and it can scarcely be claimed that if the parents are living, the children can with accuracy be styled orphans. The word "orphanage" was not used in its technical sense, and the housing of the children therein was not the main purpose —the main purpose being education.

As before stated, in order to fully understand the proposed plan, it will be necessary to consider the testimony taken in open Court.

It is ordered, adjudged, and decreed as follows:

That the trust is not indefinite, vague, or uncertain, but that it is good and must stand; that those claiming through testatrix, as opposed to the trust, have no interest whatever in the property; that the title to the property is in the City of Columbia, for the purposes set forth in the trust; that the plan worked out by the trustees, for the execution of the trust, is not a perversion thereof, but will carry out the main purpose thereof: Provided, however, That the plan shall be so amended as to provide for children who reside near the City of Columbia. And, provided further,

That the title to the property remain in the City of Columbia, and that the trustee shall not surrender its trust, and that it shall elect the superintendent and teachers of the public schools as its agents to carry out the trust.

And it is further ordered, adjudged, and decreed that, in the event it should finally be decided that the trust cannot be executed under the proposed plan, yet, nevertheless, the trust is good and enforceable under some other plan, and that in case it should become necessary, another trustee be appointed for that purpose.

And it is further ordered, adjudged, and decreed that the administrator is entitled to have his attorney paid a reasonable fee out of the trust fund, the amount thereof to be hereafter ascertained.

The question as to who shall pay the costs of this action is left open for further adjudication.

Leave is hereby given the parties to apply at the foot of this decree for such other and further orders as may be necessary.

*Messrs. Weston & Aycock,* and *Hunter A. Gibbes,* for appellant, Margaret C. Yawn, cite: *Will to be read in light of circumstances surrounding testator to determine intention:* 18 S. C., 94; Rood on Wills, Secs. 428, 433. *Words given primary meaning in absence of ambiguity:* 4 Rich. Eq., 233; Rood on Wills, Sec. 428. *Court to follow law and not sympathies:* 9 Am. Dec., 619. *Cy pres doctrine not adopted in South Carolina:* 93 S. C., 455; 23 S. C., 472; 10 S. C., 385; 3 S. C., 502; 2 Strob. Eq., 395; 2 DeS., 431. *Cases distinguished:* 93 S. C., 455; 48 S. C., 444; 1 Rich. Eq., 99; 226 U. S., 125; 57 L. Ed., 155. *"Charity":* 1 Rich. Eq., 99; 14 L. R. A. (N. S.), 52. *Charitable trust void for indefiniteness and uncertainty:* 126 S. C., 89; 48 S. C., 444; 37 S. C., 357; 8 Rich. Eq., 95; 1 Rich. Eq., 99; 2 Ill. App., 368; 25 Ga., 430; 67 Am. Rep., 669; 64 A. S. R., 756; 63 A. S. R., 248; 14 L. R. A. (N. S.), 49, 150. *Execution of charitable trust not optional with trustee:* 8

Rich. Eq., 95; 9 Ves., Jr., 401. *Unascertainable portion of trust fund given upon void trust and remainder on valid trust; whole fails:* 17 R. I., 306; 21 A., 906; 154 N. Y., 199; 61 A. S. R., 609; 27 Barb., 260. *Bequest partly for indefinite purposes and partly for charitable; whole fails:* 58 Cal., 457; 5 Humph., 170. *Will of testator, not trustee, governs:* 126 S. C., 89; 14 L. R. A. (N. S.), 130; 26 Am. Rep., 424. *Where cy pres doctrine not adopted and where trust impracticable, trust fails:* 151 Mass., 364; 128 Mass., 258; 128 A. S. R., 419; 60 A. S. R., 401. *Courts take judicial notice of current history known to every one:* 123 S. E., 787. *Will not aid charitable trust against public policy:* 14 L. R. A. (N. S.), 49. *Legacy refused goes as residuary estate:* 126 S. C., 89; 118 S. C., 510; 71 S. C., 175; 36 S. C., 302; 21 S. C., 455; 11 S. C., 375; 10 S. C., 414; 3 S. C., 509; Rice, 196; 2 Strob., 9; 4 DeS., 429; 8 Rich. Eq., 95; 1 Rich. Eq., 465; Rich., Eq. Cas., 279; 40 Cyc., 196. *Presumption in favor of residuary legatee as against all save particular legatee to prevent intestacy:* 82 S. C., 207; 71 S. C., 175; 4 DeS., 243. *School board without authority to maintain orphanage:* 21 S. C., 435.

*Messrs. D. W. Robinson and D. W. Robinson, Jr.,* for appellant, Louise B. Kendall, cite: *Object of construction to ascertain will of testator:* 118 S. C., 523; 111 S. E., 793; 115 S. C., 163; 113 S. C., 419; 104 S. C., 445; 82 S. C., 213; 1 McC. Ch., 70; 1 Shouler on Wills, 5th Ed., Secs. 466, 469; Page on Wills, Secs. 460, 461. *Intention of testator gathered from whole will:* 118 S. C., 523; 113 S. C., 419; Shouler on Wills, 5th Ed., Secs. 468, 473; Page on Wills, Sec. 462. *Circumstances surrounding testator admissible to aid construction of doubtful words:* 118 S. C., 523; 113 S. C., 419. *Clear expressions do not yield to doubtful ones:* 27 L. R. A., 1093; 56 N. C., 369; 28 R. C. L., 218; Shouler on Wills, 5th Ed., Secs. 461, 468, 499; Jarmon's Rules of Interpretation, No. 12. *Fee defeasable:*

2 Hill Eq., 552. *Words enlarging or restricting gift:* 124
S. C., 451; 104 S. C., 444; 102 S. C., 11; 51 Conn., 438;
83 Ala., 484; 3 So., 618; 147 Mass., 613; 6 S. C., 480; 35
Atl., 582; 2 Alexander on Wills, Secs. 966, 977; 1 Shoulder
on Wills, Secs. 467, 490. *Purpose and effect of residuary
cause:* 115 S. C., 216; Id., 162; 109 S. C., 421; 82 S. C.,
213; 10 Rich. Eq., 538; 4 Rich. Eq., 31; 2 Strob. Eq., 99;
1 Hill Ch., 97; 93 S. E., 439; 56 Atl., 131; 57 N. E., 317;
45 N. Y. S., 1117; 30 Conn., 301; 10 A. L. R., 1523; 2
Alexander on Wills, Secs. 669, 677; 2 Jarman on Wills,
369; 3 Jarman on Wills, 45; Gardner on Wills, Sec. 124;
Hawkins on Wills, 2nd Ed., 46; Bigelow on Wills, 320.
*Donee on condition subsequent has reasonable time in which
to perform condition:* 83 U. S., 231; 21 L. Ed., 456; 2
Alexander on Wills, Secs. 1036, 1047; Shouler on Wills,
Secs. 598–600. *On condition subsequent broken, property
reverts to heirs:* 2 Alexander on Wills, Secs. 1036, 1048.

*Mr. Edward L. Craig,* for respondent, cites: *Devise
in question for definite purpose:* 48 S. C., 451. *"Charitable
trust":* 122 S. C., 96; Pom. on Tr., Sec. 1019. *Duty of
trustee to devise scheme for executing trust:* 48 S. C., 451.
*Details of trust need not be followed exactly:* 93 S. C., 455;
36 N. J. Eq., 310. *Legal presumption against intestacy:*
118 S. C., 510. *Of two constructions possible, one valid
and one invalid, the valid prevails:* 2 Hill Eq., 304. *Governing
body of Columbia Public Schools:* 17 Stat., 404.
*Domestic training schools advantageous:* 57 L. Ed., 155.
*Power of school trustees when will executed:* Sec. 1076,
Code, 1893. *Courts will not allow trust to fail for want of
trustee:* 3 Rich. Eq., 160; Rice Eq., 243; 6 Cyc., 973.

*Messrs. Nelson & Mullins,* for respondent, C. S. Monteith.

July 27, 1926.

The opinion of the Court was delivered by MR. JUSTICE
WATTS.

The "case" contains the following statement:

"This action was commenced December 10, 1924, by the service of a summons and complaint, and was tried by Presiding Judge Featherstone, without a jury, at the spring term of the Court of Common Pleas for Richland County. The testimony of the witnesses was taken in open Court in the presence of the presiding Judge; the usual practice of referring the cause to the Master was not followed. The decree of the Court was filed on the 15th day of April, 1925, from which Mrs. Yawn and Mrs. Kendall have appealed."

Let the decree of Judge Featherstone be reported.

The exceptions of Mrs. Yawn maintain three propositions and are as follows:

"(1) The plan proposed by the trustees should not receive the approval of the Courts.

"(2) The charity proposed by the will is invalid, being impracticable, indefinite, and uncertain. Not a true charity.

"(3) The appellant, Margaret C. Yawn, is entitled to the property in question."

The issues as raised by the exceptions of Mrs. Kendall are:

"(a) That the property vested in the city on the conditions mentioned in the will and that the primary purpose of the will was to establish an orphanage in which should be taught, as an incident of the main purpose, the branches mentioned in the will. That the city has had a reasonable time in which to carry out and into effect the terms and conditions of the will, or to signify its acceptance. That upon the failure of the city to carry out the purposes of the will (and turning it over to the school trustees as has been done is not a carrying out of the will) in a reasonable time, the property reverts to the heirs of the testatrix and passes as intestate property.

"(b) That if the trusts are too indefinite to be carried out, or if the city does not carry out the terms and condi-

tions provided in the will, the property passes to Mrs. Kendall, the only heir, as intestate property, and is not covered or embraced in the residuary clause of the will."

The position taken by the City of Columbia and the school district is:

"The city and the school district take the position that the proposed use of this property as a regular school unit of the city system is a valid and proper construction and carrying out of the will."

A careful examination of the will of Mrs. Carroll, taken in its entirety, shows the purpose to be the establishment of an orphanage, carrying the name of the Carroll Memorial Orphanage, and the school and branches to be taught were incidents of this main purpose. There is no doubt that the intent of Mrs. Carroll was to leave the property, and it was to be maintained as an independent institution, and that the purpose was to educate for domestic servants. The object of all construction is to ascertain the intention of the testator. *Burriss v. Burriss,* 104 S. C., 445; 89 S. E., 405. *Smith v. Heyward,* 115 S. C., 163; 105 S. E., 275. *Macdonald v. Fagan,* 118 S. C., 523; 111 S. E., 793.

Courts of Equity in this State cannot devote any portion of a fund dedicated to a charitable use to any object not contemplated by the donor. Where a devise was made of a fund for the use and support of a school or institution for the benfit of poor children in a named town, any permanent appropriation of the proceeds of the fund to aid the public schools of that town, and thus lighten the taxes assessed upon the property of the city, would be a perversion of the fund from the legitimate objects of the donations.

In *Morice v. Bishop,* 9 Ves., 399 (quoted with approval in *Dye v. Beaver Creek Church,* 48 S. C., 456; 26 S. E., 717; 59 Am. St. Rep., 724), the trust was for such objects of

benevolence and liberality as the Bishop of Durham should approve. Held indefinite and void. See reveiew of cases in *Russell v. Allen,* 107 U. S., 163; 2 S. Ct., 327; 27 L. Ed., 397.

It is clear that Mrs. Carroll intended that the residence should be preserved under the name of the Carroll Memorial Orphanage, and that in the same an industrial school should be maintained for the children of indigent white persons living in or near the City of Columbia, for the purpose of training them for domestic service, so that they could gain an honest livelihood and be efficient and useful when so employed in families.

Under the will, there is no authority to use the property for any class except the children of indigent white persons, and to use it for others would be unauthorized and necessarily subversive of the testatrix's intention. The meaning that she gave in the will of the word "industrial" is clearly defined and limited by her words: Preparation for domestic service in families as a livelihood." No other form of industrial training will satisfy her intention. That is the only reasonable interpretation that can be put on the will. The will is unequivocal and cannot permit of doubt.

There is no doubt that the plan of the trustees is a subversion of the trust, as under her will she created a trust and expected it to be carried out as she intended it to be, and under her will it cannot be turned over to the public school system as contemplated; that would destroy the very object and intention of the testatrix.

Under our decisions, the plan proposed by the board cannot stand, being a wide departure from the plan the testatrix had in mind. *Busby v. Mitchell,* 23 S. C., 472. *Mars v. Gibert,* 93 S. Ct., 455; 77 S. E., 131.

We think that the attempted trust is invalid, being indefinite and uncertain and impracticable and providing no way to carry out the clear intention of the testatrix as expressed in the will.

It is conceded that it is impossible to use the property in the manner desired by the testatrix, but that fact does not confer upon the Courts the power to change the beneficiaries of a charitable trust.

We think that, the trust being void, the property passed under the residuary clause of her will or became intestate property; and Mrs. Screven having died leaving no heir except her two sisters, who died after her, leaving wills under which Mrs. Yawn become entitled, and not Mrs. Kendall, who claims as heir at law. The exceptions of Mrs. Kendall, wherein she alleges that she is entitled to the property as heir at law, are overruled. The exceptions of Mrs. Yawn are sustained and judgment reversed.

MR. JUSTICE MARION and MR. ACTING ASSOCIATE JUSTICE R. O. PURDY concur.

MR. JUSTICE COTHRAN concurs in part, and dissents in part.

MR. CHIEF JUSTICE GARY did not participate.

MR. JUSTICE COTHRAN (concurring and dissenting): I dissent from the conclusion reached by Mr. Justice Watts in this case to this extent:

I think, for the reasons advanced by his Honor, Judge Featherstone, that the trust is a valid one, and to the authorities cited by him I add the case of *Harter v. Johnson,* 122 S. C., 96; 115 S. E., 217.

I agree with Mr. Justice Watts in his conclusion that the trustee, the City of Columbia, in the plan proposed, is not complying with the purposes of the trust.

What the creator of the trust intended was that the trustee should establish, upon the real estate devised, an institution in which the children, male and female, of indigent white persons living in or near the City of Columbia, should be trained in domestic service. That this referred to a service in which they would be employed and paid for, after the training had been completed, is demonstrated by the phrase,

"thus enabling them to *gain an honest livelihood* or support for themselves *and* be efficient and useful *when so employed in families.*"

The City of Columbia, having accepted the trust, must see that it is fulfilled, or surrender it. It is the duty of the Court to see that this is done, and to appoint a new trustee should the present trustee fail in its duty.

We may think that the trust is impracticable and unwise, but we cannot anticipate the conclusion that it is impossible of fulfillment. The property was that of the testatrix and she had the power of disposing of it according to her will, if not opposed to law; and, until by experiment it shall have been shown to be impossible of enforcement, the testatrix is, at least, entitled to that experiment.

The trust answers every requirement of a charitable trust, upon its face, is not in conflict with any provision of constitutional or statutory law, and is not opposed to any principle of public policy that I can conceive.

Even if it should be positively ascertained that the trust as outlined by the founder is so impracticable as to be impossible of enforcement, it does not necessarily follow that a reversion to the estate of the founder is the result. The trust will still be under the control of the Court to make such disposition of it as will comport with the evident purpose of the founder.

I think that the decree should be modified to conform herewith, and that the case should be remanded to the Circuit Court and held there, the administration of the trust being under the supervision and control of the Court.