## 19604

The SOUTH CAROLINA NATIONAL BANK, as Successor to the First National Bank of Greenville, as Executor and Trustee of the Estate of J. E. Sirrine, Plaintiff-Respondent, v J. H. BONDS et al., Defendants-Appellants-Respondents, Defendants-Respondents-Appellants, and Defendants-Respondents.

(195 S. E. (2d) 835)

328

*W. W. Wilkins, Esq.,* of Greenville, *for Appellants-Respondents,*

*Messrs. Rainey, Fant & McKay, E. P. Riley,* and *Andrew B. Marion,* of Greenville, *for Respondents* and *Respondents-Appellants,*

April 3, 1973.

*Per Curiam:*

Careful consideration of the record and the briefs and oral argument of counsel convinces us that the decree of the lower court properly disposes of all issues in the cause. Accordingly, the decree of Judge Rhodes, here appealed from, as published herewith, is adopted as the opinion of the Court.

/s/ JOSEPH R. MOSS C. J.

/s/ J. WOODROW LEWIS A. J.

/s/ THOS. P. BUSSEY A. J.

/s/ J. M. BRAILSFORD A. J.

/s/ BRUCE LITTLEJOHN A. J.

## ORDER OF JUDGE RHODES

Joseph E. Sirrine, a resident of Greenville County, South Carolina died testate on August 7th, 1947, said will being dated June 5th, 1941, with later codicils not pertinent to the question before this Court. Under the will, the decedent, after making a number of specific devises and bequests, left the residue of his estate in trust with the income to go to his niece Jane S. Cothran, and his brother, William G. Sirrine, for and during their natural lifetimes. Upon the death of William G. Sirrine, his wife, Nana McL. Sirrine, was to take his share of the net income during her lifetime. After the death of the last life tenant, the income was to go to the child or children of Jane S. Cothran. It was further provided that should Jane S. Cothran not leave a child or grandchild surviving her at the time of her death, the following provision of the will would become operative:

"22. Upon the death of the survivor of them, the Trustee shall hold my estate then remaining in its hands as a perpetual memorial to my father and mother to be known as 'Sirrine High School Fund', the income to be used for assistance of deserving students of Greenville City High Schools in completing their education. The Board of Trustees shall make such selections annually from the graduates as the Board may think proper, having in mind their needs and capacity. The income shall be expended by the Board or under its discretion. My Trustee may require the Board of Trustees to give receipts for all or part of the income and thus permit the Board to disburse it themselves, or my Trustee may at its option make payment of all or part directly to the students who are properly authorized to receive aid from the Fund."

On August 25th, 1971, Jane S. Cothran, the last survivor of the above named life tenants of the trust, died leaving no child or grandchild surviving her, and the charitable trust created by paragraph twenty-two (22) of the decedent's will became operative.

The plaintiff, South Carolina National Bank, has succeeded First National Bank as Trustee, and has brought this action pursuant to Sections 10-2001 *et seq.* of the Code of Laws of South Carolina (1962) requesting the Court to issue a declaratory judgment defining both the class of persons from which beneficiaries are to be selected and other guidelines for the proper administration of the trust under present conditions. The defendant, Daniel McLeod, Attorney General of South Carolina, who is charged with the responsibility of protecting public charities under Section 1-240 of the Code, filed an answer denying the material allegations of the complaint based on lack of information sufficient to form a belief, but did not appear at the hearing. The minor defendant, Knox White, individually and as a representative of a class composed of all high school students now or hereafter attending high school within the School District of Greenville County or successor school district and residing within the territorial confines of the school district formerly served by the Greenville City High Schools, was properly served and represented before the court by W. W. Wilkins, Esq., a member of the Greenville Bar, his duly appointed Guardian *ad Litem.* The minor defendant Mark Smith, individually and as a representative of a class of all high school students residing outside of the territorial confines of the old school district formerly served by the Greenville City High Schools was properly served and represented before the Court by Andrew B. Marion, Esq., a member of the Greenville Bar, his duly appointed Guardian *ad Litem.* Both of the Guardians *ad Litem* for the minor defendants and the classes they represent filed answers, appeared and vigorously participated in the hearing, submitting able briefs and oral arguments on their behalf. The remaining defendants constitute all of the members of the Board of Trustees of the School District of Greenvile County and were ably represented by E. P. Riley, Esq., also a member of the Greenville Bar.

The major issue before the Court is to define the class of "deserving students" from which the beneficiaries of the trust fund are to be selected. In con-

struing the terms used by the Testator in his will, the paramount consideration of this Court is to ascertain and effectuate the intent of the Testator. *Miller v. Rogers,* 246 S. C. 438, 144 S. E. (2d) 485 (1965). While primary resort must be to the words themselves, where there is a latent ambiguity or uncertainty, parol evidence may be received in order to determine the Testator's intent.

"In ascertaining the subject of a testator's disposition, the court may inquire into the situation of his estate, and into every material fact which is auxiliary to the just interpretation of his words, for the purpose of identifying the thing intended by the words employed (cites).

"Any evidence is admissible which merely intends to explain and apply what the testator has written; and no evidence can be admitted which merely shows what he intended to write." *Shelly v. Shelley,* 244 S. C. 598, 606, 137 S. E. (2d) 851, 855 (1964) ; accord, *Sutcliffe v. Laney Bros. Inc.,* 247 S. C. 417, 147 S. E. (2d) 689 (1966).

Although the Testator's words "deserving students of Greenville City High Schools" do not appear ambiguous on their face, many changes have taken place since the Testator's death, as will be hereinafter developed, and the application of such language to the current factual situation results in certain latent ambiguities and uncertanties.

Among the changes which have taken place since the Testator's death is the tremendous growth in the the market value of the trust itself. In 1949, after the payment of the estate's debts and taxes, the market value of the trust corpus was only Two Million, One Hundred Seventy-Eight Thousand ($2,178,000.00) Dollars. The value of the trust as of August 1971 was Six Million, Seven Hundred Fourteen Thousand, Eight Hundred Nineteen ($6,714,819.00) Dollars. While there is no direct evidence as to the Testator's net worth during his lifetime, it appears unlikely that he contemplated a trust fund of the current magnitude.

The most drastic relevant change which has taken place since 1947, however, is the total reorganization of the pub-

lic school system of Greenville County. At the time of the making of the will and at the time of the Testator's death, Greenville County was divided into eighty-two (82) separate and distinct school districts, each governed by its own Board of Trustees. The largest and most significant of these districts was the Greenville City School District, the boundaries of which corresponded with the city limits of Greenville. In 1941, when the Testator prepared his will, the total enrollment of all grades of the City School District was eight thousand five hundred sixteen (8,516) pupils, while the total enrollment of the other school districts in the county was twenty-five thousand, seven hundred thirty-one (25,-731). Greenville High was the only high school located within the city limits, but Sterling High, a Black high school located just outside the city limits, was under the control of the Board of Trustees of the Greenville City School District and was considered a "city high school". In 1967, Sterling High was destroyed by fire, and at the present time, Greenville High is the only high school located within the old city school district as it existed at the Testator's death. Students who normally would have attended Sterling High now attend numerous other high schools in the county.

In 1951, the General Assembly authorized and empowered the County Boards of Education to consolidate school districts when such consolidation would promote the best interests of education in the respective counties. STAT.ACT No. 379 at 661. Pursuant to this authorization, that same year, the eighty-two (82) school districts of Greenville County were consolidated into one countywide school district now known as the "School District of Greenville County" with its own Board of Trustees. The individual Boards of Trustees for the old eighty-two (82) school districts, including the Board of Trustees for the Greenville City School District, were thereby dissolved and under the consolidation statutes, the new county-wide Board acquired the assets, liabilities, powers, and duties of the former multiple district boards. At the present time, there is no signifi-

cance attached to the old school district boundary lines in the administration of the county-wide school district.

Even prior to consolidation, however, it is significant to note that the Greenville City School District was automatically expanded with each expansion of the city limits of Greenville. Three such expansions occurred during the Testator's life: in 1932 and in 1939 before the writing of his will, and in 1946 after the writing of his will. Four more expansions of the city limits occurred before the 1951 consolidation which more than doubled the size of the city (and consequently the Greenville City School District). In addition, just prior to the consolidation, the East Gantt and Laurel Creek areas located outside the city limits of Greenville were made a part of the city school district. It can be reasonably assumed that the Testator, as the founder of a leading engineering and architectural firm, was aware of and interested in the development of the Greenville area and contemplated such expansions in the city and the school district.

As a result of the consolidation of school districts (with several minor changes which have since been authorized), the School District of Greenville County except a small portion in the upper part of the county which is in a Spartanburg County district and embraces a portion of Laurens County adjacent to Fountain Inn and a portion of Spartanburg County adjacent to Greer. There are currently fourteen (14) high schools in the consolidated school district, all located within the geographical limits of Greenville County, with a 1971 total enrollment of sixteen thousand thirty-four (16,034) students, of which approximately thirty-two hundred (3,200) graduate annually. Of this total number of students, three hundred eighty-four (384) reside in Spartanburg County and four hundred and sixty-four (464) reside in Laurens County as compared with only seventy-seven (77) students who live in Greenville County but attend high school in Spartanburg County. There are three high schools now located within the old city school district as it existed

at the time of consolidation: Greenville High, J. L. Mann High completed in 1964, and Southside completed in 1970. These three high schools are also the only high schools located in the present city limits of Greenville. The 1971 enrollment in these schools was three thousand seven hundred (3700) students, with a graduating class of approximately six hundred and fifty (650). There is only one high school, Greenville High, located in the old city school district as it existed at the time of the Testator's death, and its 1971 enrollment was approximately one thousand two hundred (1,-200) students, with a graduating class of two hundred fifty (250).

In addition to the changes brought about by the consolidation of school districts and the expansion of the city limits, an equal if not greater change was created in 1970 with the implementation of busing plans to achieve racial integration. As a result of these plans, promulgated by Federal Court order, students who reside within the old city school district and who normally would have attended city high schools are required to attend high school outside the city, while a substantial number of students from throughout the county are now bused into the old city school district. While no figures were available as to the exact number of students that are currently bused to and from the old city school district as it existed at the Testator's death, figures which were introduced to show the number of students bused to and from the city school district as it existed at the time of consolidation clearly illustrate the extent of busing in Greenville County. Of the four thousand three hundred fifty-nine (4,-359) high school students now residing within this district, as it existed at the time of consolidation, one thousand two hundred sixty-nine (1,269), or twenty-nine percent, attend high school in nine of the eleven high schools located outside the district, while six hundred sixty-three (663) students residing outside the boundaries of the city district, as it existed in 1951, are required to attend one of the three city high schools.

Under these changed conditions, it is the opinion of this Court that the objectives of the Testator would be almost totally frustrated if the beneficiaries were limited to the "students of the Greenville City High Schools." With the destruction of Sterling High in 1967 and the introduction of court-ordered busing in 1970, such a proposal would be manifestly unfair, as deserving students who normally would have attended school in the old city district and who certainly were intended by the Testator to participate in the trust fund, would be deprived of such an opportunity merely because of a change in conditions which the Testator could not have reasonably anticipated. In addition, Dr. M. T. Anderson and Dr. W. F. Loggins, who both held prominent positions for many years in both the old Greenville City School District and the new consolidated district, testified that from the 1920's until the 1951 consolidation a significant number of students (approximately seventy-five per year) from throughout Greenville County and even from surrounding counties attended Greenville High on a space available basis because their own schools were often not accredited and because Greenville High offered the best college preparatory program. It also appears that Sterling High followed the same practice. Fortunately, this disparity between city and county schools no longer exists as the eleven high schools located in the county are substantially equal in size and quality to the three city high schools. As a result of this progress, however, the literal application of the Testator's words would not only deprive those students who are bused out of the city an opportunity to participate in the trust fund, but would also eliminate many students now attending other high schools who in 1941 and 1947 would most probably have applied for and been accepted as students of a Greenville City High School under the policy of inclusion then existing. Furthermore, the testimony reflects that such a restriction would place a most difficult administrative burden on the Board of Trustees. Not only would a large number of students attempt to use existing channels

to transfer to eligible school or schools, but great pressure would be placed on the school board to expand the capacity of "city schools" or even to build more schools within the city limits for no other reason than expanding the class of eligible students.

There is an additional reason why restricting the class of potential beneficiaries to graduates of city high schools woud not serve to carry out the Testator's intentions. With a trust income which now exceeds Four Hundred Thousand ($400,000.00) Dollars annually, such a restriction would result in a qualifying standard much lower than the Testator anticipated. It would be illogical to suggest that the Testator, who was concerned with aiding "deserving" students based on "needs and capacity", would want this substantial sum apportioned only among either the two hundred and fifty (250) graduates of Greenville High or the six hundred and fifty (650) graduates of the three city high schools. It must be borne in mind that the above numbers would be greatly reduced by reason of the fact that many would not be interested in pursuing further education.

However, in spite of all the changes which have taken place since the Testator's death and the inequities which would necessarily result from a literal application of the will, this Court is aware that there are limitations on its authority and that a distribution of these funds must be in accord with the intent of the Testator. The role of this Court is simply to ascertain and effectuate the intention of the Testator. In trying to effectuate this intention, however, there is no question that where conditions have substantially changed, the Court is allowed considerable discretion.

Although our Supreme Court in *Mars v. Gilbert,* 93 S. C. 455, 77 S. E. 131 (1913) expressly rejected the doctrine of equitable *cy pres* (which allows a court in limited circumstances to apply the funds of a charitable trust to a different charitable purpose), it made it clear that the literal compli-

ance with the terms of a will is not always required when the conditions have changed.

"It does not result, however, that the details of the plan laid down in the will must be followed to the letter. The main purpose being kept in view, considerable flexibility will always be allowed in the details of the execution of a trust, so as to adapt it to the changed conditions." 77 S. E. at 135.

In that case the court construed a will providing for the establishment and maintenance of an agricultural and mechanical school in Abbeville County to provide training for twenty-four (24) selected poor boys and girls but also for any other children in the neighborhood as could be accommodated and who would be required to pay according to their means. This school was actually established and maintained for a number of years, but with the institution of the public school system which duplicated the training except for the agricultural and mechanical aspects, it became impractical. The Supreme Court refused to approve the trustee's plan to use the trust income for college scholarships for children of the area since this was a departure from the Testator's obvious intention to provide help at the beginning of school life rather than at the college level. The Supreme Court did find, however that the funds could be used to provide argicultural and mechanical training at the public schools of the area. While this was certainly a departure from the strict terms of the trust, it was found to be within the Testator's purpose and intention to benefit the boys and girls of the entire community by providing early agricultural and mechanical training.

The strongest enunciation of the principle that under changed conditions the terms of a trust may be altered to carry out the Testator's purpose is found in the recent case of *Furman University v. McLeod,* 238 S. C. 475, 120 S. E. (2d) 865 (1961). In this case, the court held that even though the consideration for land conveyed to Furman University was the establishment and maintenance of a male and

female school in the vicinity of the village of Greenville, under the changed conditions that had taken place since the conveyance, Furman had the power to sell the property and move its campus outside the city limits. The unequivocal language of the court in this case leaves no doubt that in the present case the court has the authority to deviate from the strict terms of the trust in order to effectuate the Testator's intent. After discussing the unquestionable advantages of the move, the court stated the following:

"In the light of the development and expansion of Furman University which has taken place, made necessary by reason of the changing conditions, it would be unreasonable to believe that Vardry McBee, who, according to testimony given in this case, was a prominent public spirited and civic minded citizen, as were also the Trustees of The Greenville Academies, intended that the Academy which they were interested in establishing and having maintained, forever and anon would have to remain within the small confines of what was then little village of Greenville. It would be unfair to consider them so short sighted that they never envisioned further growth, development and expansion." 238 S. C. 489, 120 S. E. (2d) 871.

The court went on to point out that in its opinion there were no words expressive of any intent that the Academy should be located and always maintained on the specific property conveyed, but it made it clear that even if there was such a requirement, the changed conditions justified a deviation.

"Even were the Court to adopt the strict or technical construction for which the defendant contends, that the terms of the deed required that the Academy be built and maintained on the specific land conveyed or in the limits of the Village of Greenville as then constituted, *the Court of Equity has the power upon a proper showing, to permit a deviation from the strict terms of a trust if necessary or advisable to carry out the purposes thereof.*" (emphasis added) 238 S. C. at 490, 120 S. E. (2d) 872.

While the court in the case of the *City of Columbia v. Monteith,* 139 S. C. 262, 137 S. E. 727 (1926) and in several very early cases refused to allow departures from the terms of the trusts involved, these were situations in which the proposed departures went beyond the Testator's express intent. In the *Monteith* case, for example, the testatrix left property to the city of Columbia to be used as "an industrial school for the children of the indigent white persons living in or near the city of Columbia wherein children shall be trained for domestic service * * *." The city accepted the property for the purpose of using it as a unit of the city school system wherein they would be taught courses embracing industrial training and domestic science. The court found that the testator's words "children of the indigent white persons," precluded an intent or purpose to benefit the children of the community in general and, therefore, such a departure would go beyond the testator's purpose.

The very early South Carolina cases of *Attorney General v. Jolly,* 2 Strob. Eq. 379 (1847) and *Pringle v. Dorsey,* 3 S. C. 502 (1872) also involve attempts to go beyond the testator's stated purpose and intention. In the *Jolly* case the Testator left the remainder of his estate "to the Methodist Church of which * * * (his wife) may be a member at the time of her death * * *." Both the particular congregation of which his wife was a member and the larger church body to which this congregation was associated claimed the remainder. The large church organization took the position that since the location of the particular church was in a rural, sparsely populated area with few members the funds would be wasted. The court found that the Testator meant the wife's particular congregation and further pointed out that even if this congregation could not use the funds such could not be diverted to another purpose. The court did go on to point out that the evidence showed various ways in which the fund could be used to benefit the congregation of the wife's church and was apparently willing to countenance considerable latitude in determining the specific details as to use of the money for that purpose.

In the *Pringle* case, the trust was for the benefit of the "congregation of Christ Church, Columbia, South Carolina" which was subsequently destroyed by fire and never rebuilt. Neither the trust language nor any other evidence in the case indicated an intent on the part of the Testator to benefit any other organization but this church. Therefore, no departure from the trust was authorized by the court.

The express recognition in the *Mars* and *Furman* cases of the principle that a court of equity can deviate from the strict terms of a trust where there are changed conditions is clearly the accepted view. The Restatement of Trusts makes it clear that there is a distinction between the power of a court to apply the trust property to a different charitable purpose from that designated by the terms of the trust (the doctrine of *cy pres*) and the power of a court to authorize a deviation from the terms of a trust to carry out the Testator's purpose.

"The Court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust." Restatement (second) of Trusts § 381 (d) ; accord 89 C. J. S. Trusts § 87 (b).

After a careful study of the will in light of the circumstances existing at the Testator's death, I am convinced that the Testator's primary purpose was to create a perpetual memorial to his mother and father by aiding deserving high school graduates in pursuit of their education. It is only natural that the Testator chose the Greenville City School District as the logical administrative entity through which he could channel his philanthropic desires. With the many changes which have taken place since the Testator's

death, as hereinabove detailed, it is obvious that if the terms of the trust were literally complied with and the beneficiaries limited to the graduates of "Greenville City High Schools," the Testator's main purpose would be defeated rather than effectuated. Under the authority granted to this Court to deviate from the strict terms of a trust in such situations, the problem before the Court is to designate the most effective method of administering same in order to assure that the Testator's desires will be fulfilled.

The defendant, Knox White, representing those students presently residing in the old city school district, contends that the beneficiaries should be limited to those students "residing" in the old school district regardless of where they attend school. While such a plan is administrable, it is not consistent with the Testator's expressed intentions as nowhere in his will did the Testator even suggest a residency requirement. Furthermore, the fact that during the Testator's life a significant number of students from throughout the county and even from surrounding counties attended city schools substantiates the view that the Testator never intended to exclude students from other areas. The imposition of a residency requirement by this Court would unduly restrict the class of eligible participants and arbitrarily exclude a number of perons who were intended by the Testator to participate in the trust fund.

The plaintiff, The South Carolina National Bank, and the remaining defendants, Mark Smith, representing those students residing outside the old city school district but within the Greenville County School District, and the Greenville County School Board suggest another alternative. It is their position that the deserving graduates of all the high schools administered by the County School Board including the fourteen (14) high schools now located within the consolidated district and any other high schools which may be located in the future or come within the administration of the Board, should be eligible to participate in the trust fund. After careful deliberation, I have

concluded that under the present factual conditions, this is the only logical method of administering the trust so as to fully effectuate the Testator's intent and purpose and such method is hereby adopted and approved by this Court. As above stated, it was the Testator's desire to create a perpetual memorial to his mother and father by aiding deserving students, and it would be inconsistent with this desire if the effect of the Court's ruling were to create inequities or disruption in a public school system which he revered so highly. In a dynamic and ever-expanding community such as Greenville, it is only reasonable to conclude that the Testator, a prominent, public spirited and civic minded citizen, envisioned that trust as a live organism that would be adaptable to the changed conditions that woud inevitably be wrought by the passage of time. It is to be emphasized that under this view, no student is made eligible to participate in the trust fund who could not have been made eligible by the Board of Trustees of the old city school district were it still in existence and following the enrollment policy which it was following in 1941 when the will was drawn and in 1947 when the Testator died.

* * *

The Court is also asked to rule on the authority of the Board of Trustees of the Greenville County School District to exercise the powers granted to the Board of Trustees of the Greenville City School District in the Testator's will. All of the parties to this action agree that the Greenville County Board has succeeded to such powers. In authorizing the consolidation of school districts in 1951, the General Assembly specifically provided that the assets and liabilities and the powers and duties of districts forming the consolidated school district would succeed to the consolidated school district. Stat.Act. No. 379 at 661. The Board of Trustees of the Greenville County School District is hereby designated as the legal successor to the Board of Trustees of the Greenville City School District in exercising the powers and duties granted to the old city board un-

der the will, and the plaintiff is authorized to pay the net income under the trust to, the Board of Trustees of the School District of Greenville County without further liability for the income so distributed.

Several questions in the plaintiff's prayer are concerned with the criteria for the selection of beneficiaries. The Testator did not place any limitations on the discretion of the Board of Trustees in choosing "deserving students" other than to consider the "need and capacity" of potential beneficiaries and to use the funds to aid them in "completing their education". It would therefore follow that the Board has very broad discretion in establishing criteria for selection of graduates, the types of education covered, the amounts to be spent on the individual beneficiaries and other adminstrative questions of this nature.

Finally, the plaintiff inquires as to whether the Board may set up a permanent administrative organization at a reasonable cost to the trust fund to perform certain investigation, testing, and other administrative functions in selecting the graduates to participate in the fund. In view of the size of the fund involved, it is obvious that the board must set up such an administrative organization, and clearly this is allowable under the broad discretion given to the Board by the Testator.

It is so, ordered.