## 18258

Lanneau SHELLEY, Appellant, v. Mrs. Gertie SHELLEY, Mrs. Gertie Shelley as Executrix of M. B. Shelley, Estaleen S. Ganis, Evelyn S. Perritt (Perry), Bevin Shelley and Eugene Shelley, Respondents.

(137 S. E. (2d) 851)

*Mr. J. Reuben Long, Esq.,* of Conway, *for Appellant,*

*Messrs. Stevens & Holt,* of Loris, *for Respondents,*

September 3, 1964.

BUSSEY, Justice.

This appeal involves a somewhat unique land line controversy between two brothers, Lanneau Shelley and Bevin Shelly, arising under the terms of the will of their father, M. B. Shelley. On or about January 6, 1949, the said M. B. Shelley and his wife, Mrs. Gertie Shelley, each being possessed of certain real estate or interests therein, went to the office of an attorney for the purpose of preparing a will or wills, and as a part of the transaction Mrs. Shelley conveyed her property to Mr. Shelley, who executed a will which devised his real estate to Mrs. Shelley for life and thereafter made provision for all his children, five in number. Mr. Shelley died September 24, 1956, leaving in force his said will which was duly admitted to probate.

The portion of the will under which the present controversy arises is as follows:

"The home place, known as the Sam Q. Floyd place, is to be divided between Bevin Shelley and Lanneau Shelley; Bevin Shelley to have the southern part, same to include the filling station site, one tenant house and two tobacco barns; Lanneau Shelley to have the northern part which includes the house where he lives, the home house, three tobacco barns and two small houses now on the land also packhouse and stalls. That Bevin Shelley and Lanneau Shelley are charged with the payment of $2,000.00 to Eugene Shelley, each to pay an equal part of the $2,000.00; the same to be a charge against said land and same to be paid within a period of five years after my death."

Lanneau and Bevin Shelley thus occupy the position of vested remainderman, subject to the charge in favor of Eugene Shelley and subject to the life estate in Mrs. Gertie Shelley.

This action was commenced by Lanneau Shelley to have the court construe the will of M. B. Shelley and determine the dividing line between the land devised to the said Lanneau Shelley and that devised to Bevin Shelley. Although Mrs. Gertie Shelley was made a party individually and as executrix, as were all the devisees named in the will, the only controversy is between Lanneau and Bevin Shelley.

By consent, the cause was referred to the Master of Horry County who took the testimony and filed his report. From an order of the circuit court, substantially confirming the report of the master, and decreeing that the tract be equally divided between Lanneau Shelley and Bevin Shelley as to acreage, and insofar as possible as to value, excluding and not taking into consideration the value of any buildings on the land Lanneau Shelley appeals.

Although there are a number of questions involved, the primary question before the court is the proper construction of the will involved. More precisely and specifically stated, the question is, did testator intend, as contended by Bevin, that Bevin should receive acreage equal to that of Lanneau, or did testator intend that Lanneau should receive acreage greater than that received by Bevin?

In the construction of a will the primary purpose of the court is to arrive at testator's intention as expressed in his will considered as a whole. His intention must be ascertained from the language he used where it is clear and unambiguous. *Wolfe v. Wolfe,* 215 S. C. 530, 56 S. E. (2d) 343.

In construing a will primary resort is to the words used by testator, but, where words used are incapable of application, as they stand, parol evidence may be received in order to show the meaning which testator intended them to have. *Boykin v. Capehart,* 205 S. C. 276, 31 S. E. (2d) 506.

A will must be so construed as to carry out the real intention of testator as gathered from all attendant circumstances. *Newnham v. Forest Hills, Inc.,* 195 S. C. 431, 12 S. E. (2d) 10.

"The intent must be gathered from the whole instrument, attributing due weight to all its language, considered in the light of the circumstances known to the testator at the time of execution. If practicable, effect must be given to every part. If it can be done by any reasonable construction, all clauses must be harmonized with each other and with the will as a whole. *Burriss v. Burriss,* 104 S. C. 441, 89 S. E. 405; *Wates v. Fairfield Forest Products Co., Inc.,* 210 S. C. 319, 42 S. E. (2d) 529; *Peecksen v. Peecksen,* 211 S. C. 543, 34 S. E. (2d) 787." *Shevlin v. Colony Lutheran Church,* 227 S. C. 598, 88 S. E. (2d) 674.

With these principles in mind, we now consider the language of the will, as applied to the particular property involved in the controversy. The will contains no express provision that the property be divided "equally" or "share and share alike". Neither does it precisely set forth a dividing line between the northern part and the southern part. A plat of the property in evidence, made subsequent to the death of the testator, reflects that the tract of land in question is approximately, although not exactly, an oblong, rectangular parallelogram which, lengthwise, lies very nearly north and south and contains slightly more than sixty-eight acres, exclusive of a public cemetery and portions of the land occupied by public highways. The plat of the property shows the location of the various buildings referred to in the will and on the property at the time of making the will. It is readily apparent therefrom, that any line which would run in approximately an easterly-westerly direction, so as to divide the tract into a northern part and a southern part of anything like equal acreage, would of necessity leave upon the southern part of the tract, devised to Bevin, the residence of Lanneau Shelley, one tobacco barn and one tenant house, all of which were expressly devised to Lanneau. It thus

becomes quite apparent that when the language of the will is applied to the property involved, a latent ambiguity, equivocation or uncertainty arises as to precisely where the testator intended the dividing line to be.

If we give effect to all of the language of the testator, he intended the land to be divided into a northern part going to Lanneau, and a southern part going to Bevin. It is crystal clear that the testator intended that Lanneau's portion was to include nine buildings then on the land, and that the southern part intended for Bevin should include only four buildings. Unless some of the language of the will is to be ignored, it seems to logically follow that the testator intended a dividing line running at least in a generally easterly-westerly direction; a dividing line which would leave the buildings specifically devised to Lanneau on the northern part thereof. It, therefore, follows that he necessarily intended that Bevin should receive less acreage than Lanneau.

Contrary to the conclusion of both the master and the circuit judge, we see nothing in either the language of the will, or the evidence, which would show an intention on the part of the testator to divide the acreage equally between Lanneau and Bevin.

The circuit judge concluded that there was no ambiguity in the will, either patent or latent, and hence that it was unnecessary and improper to resort to any extrinsic evidence in aid of construction to determine the true intention of the testator. It seems to us, however, that both the master and the circuit judge clearly resorted to extrinsic evidence in order to reach the conclusion arrived at. They both attempted to solve the problem, at least in part, by the consideration and allocation of certain tobacco barns between the brothers.

At the time the will was drawn, and as reflected thereby, there were five tobacco barns located upon the land, which are referred to in the record as tobacco barns numbered

1, 3, 4, 5, and 6. Tobacco barn number 1 was located on the extreme northern portion of the tract; tobacco barn number 3 was located just about the center thereof; tobacco barn 4 somewhat to the south of the center thereof, and barns numbers 5 and 6 were located fairly close to the southern border of the property. It would thus appear, in view of the facts existing at the time the will was drawn, that testator intended that Lanneau should receive the land containing tobacco barns numbered 1, 3 and 4, and that Bevin should receive the land containing tobacco barns numbered 5 and 6.

However, in 1951, more than two years after the execution of the will, a new tobacco barn, referred to in the evidence as number 2, was constructed to the north of barn number 3, and, of course, to the north of the center of the property. Tobacco barn number 5, near the southern boundary of the property, was, according to the evidence, much older and much less valuable than the other tobacco barns. It was, however, in use several years after the will was drawn. The master concluded that the testator had the construction of tobacco barn number 2 in contemplation at the time he made his will, and that after the construction thereof, due to the age of tobacco barn number 5, testator was possessed of only five good tobacco barns, of which he intended Bevin to have two. He, therefore, reasoned that the testator intended Bevin to have tobacco barn number 4 in lieu of tobacco barn number 5.

The master justified the foregoing allocation of tobacco barns and arranging the dividing line accordingly on the theory that there were only five tobacco barns of any value at the time of testator's death and that the court was governed by the testator's holdings as of the time of his death, citing the case of *First National Bank of Holly Hill v. Bennett,* 206 S. C. 402, 34 S. E. (2d) 678, for the proposition that a will speaks as of the testator's death.

The circuit judge adopted this reasoning of the master, and in order to give Bevin tobacco barn number 4, which

incidentally is directly behind Lanneau's residence and slightly to the northwest thereof, and also give Bevin equal acreage, the commissioners appointed pursuant to the decree of the circuit court had to lay out a meandering line which for the most part ran in a general northerly and southerly direction rather than in an easterly-westerly direction. While this line would give to Bevin the extreme southern portion of the premises, it would also give him a substantial portion of the western half of the tract of land. We see nothing in the will or the evidence which would indicate that the testator intended any such results.

It is, of course, true that a will, in certain respects, speaks only as of the testator's death, but it then speaks of what was in the mind of the testator at the date when the will was signed and has to be construed in the light of the factual circumstances existing at the time of the signing of the will. *Charleston Library Society v. Citizens and Southern National Bank,* 200 S. C. 96, 20 S. E. (2d) 623.

The circuit judge concluded that no extrinsic evidence could be considered in arriving at testator's intention as to where the dividing line between the northern and southern parts should be, relying principally on the case of *Joyce v. Bode,* 74 S. C. 164, 54 S. E. 239, and the case of *Clarke v. Clarke,* 46 S. C. 230, 24 S. E. 202. In the last cited case the court quoted with approval from *Rosborough v. Hemphill,* 5 Rich. Eq. 95, 107, the following language:

"It is conceived that if the effect or purpose of parol evidence is to introduce into a will matter which it does not contain, so as to constitute it a part of the will; to give to the will in itself considered, operative elements, language or provisions which were not in it before, then such evidence is incompetent in a court whose function is to construe wills * * *. Such evidence is very different from that which is offered for the purpose of affording a light by which what is *in* the will, may be read, understood, and applied, which is always proper."

We think that there is nothing in the language of either of the cases relied upon by the circuit judge, which would prevent the court here from properly considering evidence tending to explain testator's intention, at the time of making his will, as to where the dividing line between the northern and southern parts was to be. In the case of *Scaife v. Thomson,* 15 S. C. 337, this court quoted with approval from *McCall v. McCall,* 4 Rich. Eq. 447, 455, the following language:

"In ascertaining the subject of a testator's disposition, the court may inquire into the situation of his estate, and into every material fact which is auxiliary to the just interpretation of his words, for the purpose of identifying the thing intended by the words employed." And, again from the same opinion,

"Any evidence is admissible which merely intends to explain and apply what the testator has written; and no evidence can be admitted which merely shows what he intended to write."

Since some of the testimony offered in this case dealt with declarations by the testator himself, we think it well to point out that while declarations of intention on the part of a testator are ordinarily excluded from consideration, they are, nevertheless, according to the great weight of authority, receivable to assist in interpreting an equivocation, or latent ambiguity. The prohibitory exception is based on the risk of allowing an extrinsic utterance of intent to come into competition with the terms of the document on the same subject and perhaps to prevail against them. In the case of an equivocation, or latent ambiguity, this risk does not exist. There can be no competition with the words of the document by declarations which merely expand and make more specific the words used in the document. See Wigmore on Evidence, Section 2472.

Our conclusion that the testator intended a dividing line running in a generally easterly-westerly direction lying south

of the buildings devised to Lanneau, including tobacco barn number 4, and that Lanneau should receive not only more buildings but more acerage, is reinforced by the fact that the testator and his wife had been seized of the tract of land for approximately twenty years at the time of making his will, and had lived thereon. Testator, of course, was quite familiar with the lay of his land and the location of the buildings thereon. Our conclusion is further reinforced by the fact that the will as a whole discloses an intent on the part of the testator to do by way of his will more for some of his children than he did for others. The portion of the will hereinabove quoted, for instance, gave to his son, Eugene, the sum of two thousand dollars, the only provision made for Eugene in the will. Another farm not involved in this litigation was devised in the remainder to his daughter, Estaleen, subject to a charge of two thousand dollars in favor of his daughter, Evelyn, such being the only provision made for Evelyn. There is considerable evidence in the record, much of it uncontroverted, in explaination of why the testator by his will did not attempt to treat his five children equally, the evidence being to the effect that he had done much more for certain of his children during his lifetime than he had for others.

Left undecided by this court is the factual issue as to the precise location of the dividing line intended by the testator. This being a law case, involving the title to real estate, our jurisdiction is limited to a review of errors of law. South Carolina Constitution, Article V, Section 4.

The record contains no findings of fact which would be pertinent or applicable under what we deem to be a proper construction of the will. It is, therefore, necessary that the cause be remanded so that the court below may upon consideration of all competent, admissible evidence determine the factual issue of precisely where the testator intended the dividing line to be, such factual issue, of course, to be

determined in the light of our foregoing construction of the will.

Since the cause is being remanded for further proceedings, we should point out that both the master and the circuit judge seemed to think most of the evidence offered by the parties was inadmissible by virtue of Code Section 26-402, commonly known as the dead man's statute. While we shall not here undertake to review all of the evidence, we agree that much of it was inadmissible. On the other hand, much of it was admissible, as not nearly all evidence as to transactions with a deceased person is inadmissible by virtue of said Code section. The various decisions cited in the footnote to said section collectively furnish a guide line for the court in applying the provisions of said section to any evidence offered. Particular attention is called to the case of *Norris v. Clinkscales,* 47 S. C. 488, 25 S. E. 797.

The judgment of the lower court is accordingly reversed and the cause remanded for further proceedings in accordance with the views herein expressed.

Reversed and remanded.

TAYLOR, C. J. and MOSS, LEWIS and BRAILSFORD, JJ., concur.