326 S.C. 349 (1997)
483 S.E.2d 474
In re ESTATE OF Alexina Fender FABIAN.
Rudy C. FENDER, Appellant,
v.
Paul FENDER, Personal Representative, Respondent.
No. 2640.
Court of Appeals of South Carolina.
Heard January 9, 1997.
Decided February 11, 1997.
*351 Susan T. Kinard, of Kinard & Kinard, North Charleston, for appellant.
Perry M. Buckner, Walterboro, for respondent.
CONNOR, Judge:
Rudy C. Fender brought this action to construe the will of Alexina Fender Fabian. The case was removed from the Colleton County Probate Court to the Court of Common Pleas. After a bench trial, the trial judge held Rudy[1] was not a beneficiary under the will. Rudy appeals. We reverse and remand.

Facts
In 1942, twenty-one year old Mary Grace Fender gave birth, out of wedlock, to a son she named Rudy. Mary Grace's parents, Junior Jacob (J.J.) and Eva, gathered the four oldest of seven siblings, including Mary Grace, together. The family took a solemn vow to tell the community Rudy was Eva's child. From that moment on, they agreed the siblings would *352 speak of Rudy only as their brother and the parents would call him their son. They were so dedicated to this vow that Rudy did not find out the real truth until he was 47 years old.
J.J. died in a car accident in 1971. Rudy was listed as a child in JJ.'s obituary. Additionally, when Joseph, and Jack, J.J.'s sons, and Annie Ruth Simons, J.J.'s daughter, died Rudy was listed as a brother in their obituaries.
When J.J. died, he had no will. His youngest child, Paul, was named personal representative of the estate. When Paul filed the Petition For Letters Of Administration for his father's will, he listed Rudy as a son. Thereafter, Paul evenly distributed the estate among the living siblings, including Rudy.
Alexina Fender Fabian, the oldest child of J.J. and Eva, died in 1994, leaving an estate of approximately $200,000 to "my brothers and sisters living at the time of my death." Her obituary also listed Rudy as a sibling.
Alexina had executed a will in 1976, five years after her father's death. She had named Paul her personal representative. However, in dividing Alexina's estate, Paul excluded Rudy this time, claiming he was not a brother.

Procedure
Rudy brought this action in probate court seeking to have Alexina's will construed to include him as a "brother." The case was removed to circuit court on Rudy's motion. Paul, as Alexina's personal representative, answered, and denied Rudy was entitled to any relief. The trial judge held the will unambiguous and, therefore, refused to allow extrinsic evidence in determining the testator's intent. The judge did permit Rudy to proffer the testimony and exhibits he wished to have considered.
Rudy appeals, arguing the trial judge erred in excluding extrinsic evidence to establish Alexina's intent.

Analysis
In construing a will, courts should strive to discover and give effect to the testator's intent. Fenzel v. Floyd, 289 S.C. 495, 347 S.E.2d 105 (Ct.App.1986). The first resort is always to the language of the will itself. Id. Where the *353 terms of the will are ambiguous, the court may resort to extrinsic evidence to resolve the ambiguity. Id.
There are two types of ambiguities:
Ambiguities ... are patent and latent; the distinction being that in the former case the uncertainty is one which arises upon the words of the ... instrument as looked at in themselves, and before any attempt is made to apply them to the object which they describe, while in the latter case the uncertainty arises, not upon the words of the ... instrument as looked at in themselves, but upon those words when applied to the object or subject which they describe.
Jennings v. Talbert, 77 S.C. 454, 456, 58 S.E. 420, 421 (1907).
Extrinsic evidence may be admitted to determine whether a latent ambiguity exists. Fenzel v. Floyd. Once the court finds a latent ambiguity, extrinsic evidence is also permitted to assist the court in determining the testator's intent. Jennings v. Talbert.
Rules of construction are designed to help courts determine the testator's intent as expressed in the will. Albergotti v. Summers, 205 S.C. 179, 31 S.E.2d 129 (1944). Where the testator's intent is ascertainable from the will and not counter to law, we will give it effect. Schroder v. Antipas, 215 S.C. 552, 56 S.E.2d 354 (1949). We can neither "redraft the [w]ill, nor may we doctor a crucial part." Limehouse v. Limehouse, 256 S.C. 255, 257, 182 S.E.2d 58, 59 (1971).
In construing the language of a will, we must give words their ordinary, plain meaning unless it is clear the testator intended a different sense, or unless such meaning would lead to an inconsistency with the testator's declared intention. Buist v. Walton, 104 S.C. 95, 88 S.E. 357 (1916).
Applying the above principles to this case, we must first determine whether a latent ambiguity exists. Ordinarily, brother means male sibling. However, the facts of this case are far from ordinary.
The following extrinsic evidence demonstrates some of the circumstances that create an ambiguity concerning what Alexina meant by the term "brother" when she executed her will:
*354 Alexina was born in 1915 and Rudy was born in 1942. Thus, Alexina was nearly thirty years old when Rudy was born. Thirty-four years elapsed from the time of Rudy's birth until Alexina executed her will in 1976. During this time, Alexina treated Rudy as a brother.
J.J. died five years before Alexina executed her will. As the personal representative of JJ.'s estate, Paul paid Rudy a pro-rata share. In fact, the letter Paul wrote Rudy forwarding the checks was addressed "To All Sis. & Br." As noted, Rudy was listed as a son in JJ.'s, and as a brother in Joseph's, Jack's, and Annie Ruth's obituaries. Furthermore, Alexina knew when she selected Paul as her personal representative that he had treated Rudy as a sibling in her father's estate.
There is additional extrinsic evidence Alexina continued to regard Rudy as her brother after she executed her will. For instance, Mary Grace testified Alexina gave Mary Grace a copy of a book containing the family genealogy. Rudy was listed as a sibling in the book. Alexina herself had made handwritten corrections in the book, showing she easily could have corrected Rudy's designation as a sibling if she disagreed with it.
The extrinsic evidence outlined above shows Alexina regarded Rudy as a brother at certain times during her life. Therefore a latent ambiguity exists concerning what Alexina meant by the word brother at the time she executed her will. See In re Horton's Estate, 5 N.J.Super. 518, 68 A.2d 658, 658 (Ch. Div.1949), (the Superior Court of New Jersey construed a will leaving the residue of the testator's property to "such of my nieces and nephews that shall survive me" as including grandnieces and grandnephews because extrinsic evidence showed testator did not draw a distinction between nieces and nephews and grandnieces and grandnephews; therefore her true intent was to include them as residuary beneficiaries.) See also 9 Wigmore, Evidence § 2458 (Chadbourn rev. 1981) (drawing a distinction between the standard for construction of contracts, that is, the "mutual standard of parties to a bilateral act," versus the individual standard of a testator writing a will, which means an individual "may use words in a sense wholly peculiar to himself'); accord, Tierce v. Gilliam, 652 So.2d 254 (Ala.1994) (holding the phrase "lineal descendants," *355 under the peculiar circumstances of the case, was a classic latent ambiguity requiring extrinsic evidence to ensure the testator's intent was not thwarted).
Because a latent ambiguity exists, the lower court must resolve the ambiguity by ascertaining Alexina's intent. To do this, it must look at the words of her will and the circumstances known to Alexina at the time of execution. See Shelley v. Shelley, 244 S.C. 598, 602, 137 S.E.2d 851, 853 (1964) ("A will must be so construed as to carry out the real intention of the testator as gathered from all attendant circumstances.").
Here, the trial judge erred in excluding extrinsic evidence. We therefore reverse and remand for a new trial. On remand, the court shall consider extrinsic evidence in determining Alexina's intent.
Rudy additionally argues the trial judge erred in finding his witnesses disqualified under the Dead Man's Statute. We do not address this issue in light of our previous ruling.[2]
REVERSED AND REMANDED.
GOOLSBY and HUFF, JJ., concur.
NOTES
[1] Because this case involves a family dispute, both parties and most witnesses share the surname Fender. For purposes of readability and clarity, we refer to the family members by their given names.
[2] Because this issue will come up again on retrial, the trial court may wish to consider the following principles in determining which testimony is or is not admissible under the Dead Man's Statute:

The South Carolina Code disqualifies a person from testifying at a trial concerning a will if the witness is a party or a person having an interest which may be affected by the outcome of the trial. S.C.Code Ann. § 19-11-20 (1985).
A witness is disqualified only if the testimony concerns a "transaction" or "communication" between the witness and the deceased. The Supreme Court has held "`transaction' ... implies mutuality,something done by both in concert, in which both take some part." Sullivan v. Latimer, 38 S.C. 158, 166, 17 S.E. 701, 704 (1893) (citations omitted). Moreover, that court has additionally ruled "communication" does not include testimony regarding conversations between the deceased and third parties. Ivester v. Fowler, 109 S.C. 424, 429-30, 96 S.E. 154, 155 (1918).
Furthermore, the purpose of the Dead Man's Statute is to prevent fraud. Testimony which would diminish one's share would not be disqualifying under the statute. See Holland v. Joyce, 155 W.Va. 535, 185 S.E.2d 505 (1971) (witness may testify against his own interest); Sanderson v. Paul, 235 N.C. 56, 69 S.E.2d 156 (1952) (a witness is never prohibited from testifying against his own interest).