685 S.E.2d 163

ALL SAINTS PARISH WACCAMAW, a South Carolina Nonprofit Corporation; D. Clinch Heyward, Warden for All Saints Parish, Waccamaw; W. Russell Campbell, Warden for All Saints Parish, Waccamaw; Martha M. Lachicotte, Ann Usher Mercer, Vandell Arrington and Rives Kelly, Individually and as Representatives of the Inhabitants of the Waccamaw Neck Region of Georgetown County; and Evelyn Labruce, Individually and as a Descendant of George Pawley; Of Whom W. Russell Campbell in his capacity as Senior Warden of All Saints Church, is also a Defendant by way of Counterclaim, Plaintiffs,

Of Whom All Saints Parish Waccamaw, a South Carolina Nonprofit Corporation; D. Clinch Heyward, Warden for All Saints Parish, Waccamaw; W. Russell Campbell, Warden for All Saints Parish, Waccamaw are, Respondents/Appellants,

v.

The PROTESTANT EPISCOPAL CHURCH IN the DIOCESE OF SOUTH CAROLINA; The Episcopal Church, a/k/a The Protestant Episcopal Church in the United States of America; Mark Sanford, in his official capacity as the Governor of the State of South Carolina; and John and Jane Doe, as descendants to George Pawley and William Poole, Defendants,

Of Whom The Protestant Episcopal Church in the Diocese of South Carolina; The Episcopal Church, a/k/a The Protestant Episcopal Church in the United States of America are, Appellants/Respondents,

and

Mark Sanford, in his official capacity as The Governor of the State of South Carolina; and John and Jane Doe, as descendants to George Pawley and William Poole are, Respondents.

Guerry Green, on behalf of All Saints Parish, Waccamaw, and in his capacity as Senior Warden of the same; Carl Short, on behalf of all of All Saints Parish, Waccamaw, and in his capacity as Junior Warden of the same; and George Townsend, James Chapman, and Edward Mills, on behalf of All Saints Parish, Waccamaw, and in their capacities as Members of the Vestry of the same; The Protestant Episcopal Church in the Diocese of South Carolina and the Right Reverend Edward L. Salmon, Jr., in his capacity as Bishop of the Protestant Episcopal Church in the Diocese of South Carolina, Appellants/Respondents,

v.

W. Russell Campbell, in his capacity as Senior Warden of All Saints Church; D. Clinch Heyward, in his capacity as Junior Warden of All Saints Church; Donald Alford, Butler F. Dargan, Diane Deblock, Robert L. Jones, A.H. (Doc) Lachicotte, David Lane, Lou Paquette, Hugh Patrick and Daniel W. Stacy, in their capacity as Vestry Members of All Saints Church; David E. Grabeman, in his capacity as Treasurer of All Saints Church; All Saints Church, an unincorporated association; All Saints Church, Waccamaw, Inc., a South Carolina Non-profit Corporation; Henry McMaster, in his capacity as Attorney General for the State of South Carolina; Mark Hammond, in his capacity as Secretary of State for the State of South Carolina; and John and Jane Doe, as Unknown Descendants of George Pawley, Defendants,

Of Whom W. Russell Campbell, in his capacity as Senior Warden of All Saints Church; D. Clinch Heyward, in his capacity as Junior Warden of All Saints Church; Donald Alford, Butler F. Dargan, Diane Deblock, Robert L. Jones, A.H. (Doc) Lachicotte, David Lane, Lou Paquette, Hugh Patrick and Daniel W. Stacy, in their capacity as Vestry Members of All Saints Church; David E. Grabeman, in his capacity as Treasurer of All Saints Church; All Saints Church, an unincorporated association; All Saints Church, Waccamaw, Inc., a South Carolina Non-profit Corporation are, Respondents/Appellants,

and

Henry McMaster, in his capacity as Attorney General for the State of South Carolina; Mark Hammond, in his capacity as Secretary of State for the State of South Carolina; and John and Jane Doe, as Unknown Descendants of George Pawley are, Respondents.

In re All Saints Parish, Waccamaw, a South Carolina Non-profit Religious Corporation.

No. 26724.

Supreme Court of South Carolina.

Heard March 5, 2009.

Decided Sept. 18, 2009.

430

432

Benjamin Allston Moore, Jr., Julius H. Hines, David S. Yandle, all of Buist, Moore, Smythe & McGee, and Coming B. Gibbs, Jr., of Gibbs & Holmes, all of Charleston; and David

Booth Beers and Heather H. Anderson, both of Goodwin Procter, LLP, of Washington, for Appellant–Respondents.

Attorney General Henry Dargan McMaster, Assistant Attorney General C. Havird Jones, both of Columbia; and Fred B. Newby, of Newby, Sartip, Masel & Casper, of Myrtle Beach, for Respondents.

Henrietta U. Golding and Amanda A. Bailey, both of McNair Law Firm, of Myrtle Beach, for Respondent–Appellants.

C. Mitchell Brown, William C. Wood, Jr., A. Mattison Bogan, all of Nelson, Mullins, Riley & Scarborough, of Columbia, and Lloyd J. Lunceford, of Baton Rouge, for Amicus Curiae.

Chief Justice TOAL.

This case presents two questions that arise out of a dispute over church property and corporate control: (1) whether the trial court correctly determined that a trust deed, executed in 1745 for the establishment of a Parish in the Waccamaw Neck region of South Carolina,[1] remains valid; and (2) whether the trial court correctly determined that the vestry representing a minority group of the congregation were the officers of the congregation's corporate entity, All Saints Parish, Waccamaw, Inc.

### FACTUAL/PROCEDURAL BACKGROUND

Underlying this appeal are two lawsuits that were consolidated for trial in Georgetown County. The first lawsuit ("the 2000 Action") was a declaratory judgment action filed by All Saints Parish, Waccamaw, Inc. against the Episcopal Church in the United States of America ("ECUSA") and the South Carolina Diocese ("Diocese"). The 2000 Action was precipitated by the Diocese's recording of a notice with the Georgetown County clerk of court by which it purported to put the public on notice that the congregation of All Saints Parish held its property in trust for the Diocese and ECUSA.

---

1. The Waccamaw Neck is a geographical area bounded by the Waccamaw River and Winyah Bay on the west and south, the Atlantic Ocean on the east, and the North Carolina line in the north.

After the congregation fractured, the second lawsuit ("the 2005 Action") was filed by a minority faction of the original congregation against its majority which had voted to sever ties with the ECUSA and the Diocese. The minority faction remained loyal to the denominational authorities and was represented by a vestry led by Guerry Green ("the minority vestry"). The majority group was represented by a vestry led by W. Russell Campbell ("the majority vestry"). In the 2005 Action, the minority vestry sought a declaration that they, and not the majority vestry, were the officers of All Saints Parish, Waccamaw, Inc. The 2000 Action and the 2005 Action were consolidated and tried in March 2006. This appeal is from the trial court's order.

The facts relevant to this appeal date to the early eighteenth century. By the Church Act of 1706, the South Carolina Commons House of Assembly ("Commons House") established the Church of England as the official religion of colonial South Carolina and created the first parishes in the colony. Parishes were regionally defined and served as ecclesiastical and political entities. All Saints Parish, however, was not formed at that time.

In 1734, George Pawley, a member of the Commons House, was appointed by legislative enactment to erect church buildings in the St. John's and the Prince George Parishes. He was "authorized to accept and take any grant or conveyance of any lands within said parishes respectively, to them and their heirs, in trust, for the inhabitants of said parishes." Act No. 567 at § 6, 3 S.C. Stat. 374, 375 (1734). In 1745, Percival and Ann Pawley transferred approximately 60 acres to George Pawley and William Poole. The language of this trust deed ("the 1745 Trust Deed") provided that George Pawley and William Poole were deeded the land "forever in Trust For the Inhabitants On Waccamaw Neck for Use of A Chapel or Church for divine Worship of the Church of England established by Law ...". Consideration for this transfer was "the Sum of one hundred pounds current Money of South Carolina." [2] The terms of the 1745 Trust Deed did not bestow

2. According to the "Average Earnings Index," one hundred (100) British Pounds in 1745 was worth One Hundred Forty–One Thousand, Eight Hundred Twenty–Five (141,825) British Pounds or Two Hundred

any duties upon the trustees, and there is no evidence to suggest that the trustees exercised any duties relative to the 1745 Trust Deed.

On December 10, 1766, the inhabitants of the Waccamaw Neck formally petitioned the Commons House requesting the establishment of their own parish. In 1767, an Act of the Commons House carved out a piece of the Prince George Parish, thus creating a new Parish named All Saints in the Waccamaw Neck region. Subsequently, on January 2, 1767, the 1745 Trust Deed was recorded in Charleston.[3] By 1774, both George Pawley and William Poole had died. Neither the 1745 Trust Deed nor the trustee's wills named a successor trustee. By all accounts, the property at issue has been actively used as a place of worship since at least 1767, if not before.

The relationship between South Carolina's colonial parishes and the Diocese of London was severed during the Revolutionary War. Nonetheless, the South Carolina General Assembly re-established All Saints Parish in 1778. Even though the Church of England was formally disestablished as the official religion of South Carolina in 1790, the property at issue continued to be used as a place of worship.

In 1820, the South Carolina General Assembly passed an Act which officially incorporated the wardens and the vestry of All Saints Parish. The Act expressly enabled the congregation to "have, hold, take and receive" both real and personal property. The congregation's incorporation was only effective for a period of fourteen years. In 1839, the South Carolina General Assembly renewed the incorporation for an additional fourteen years and, in 1852, the General Assembly did so indefinitely.

An 1880 Act of the South Carolina General Assembly established that title to any property belonging to inactive Episcopal corporations, churches, or dormant parishes was held in trust by the Trustees of the South Carolina Episcopal Diocese.

---

Seventy–Seven Thousand, Seven Hundred and Seventy–Eight (277,778) U.S. Dollars in 2007.

**3.** At the time, Charleston was the only place in South Carolina at which land instruments could be recorded.

The record makes clear that in 1902, due to the 1880 Act, the All Saints congregation became concerned over the status of their incorporation and the status of title to church property. Evidence in the record also indicates that this concern was exacerbated by the destruction of certain property records in a "great storm."

In May 1902, as a result of its concern, the congregation asked the Diocese to "cooperate with [them] in having the charter of th[e] Parish renewed." The Diocese's Chancellor responded positively and not only suggested that the congregation formally incorporate with the Secretary of State as a South Carolina eleemosynary corporation, but also indicated that the Diocese would execute a quit-claim deed transferring to the congregation any interest the Diocese may have had in the All Saints property.

Therefore, at the direction of the Diocese, the congregation re-incorporated in 1902 under the name "All Saints Parish, Waccamaw, Inc." Shortly thereafter, in 1903, the Trustees of the Diocese signed a quit-claim deed (hereinafter the "1903 Quit–Claim Deed") transferring any interest the Diocese may have had in the congregation's property to All Saints Parish, Waccamaw, Inc. The Diocese did not retain any interest in the property, reversionary or otherwise. The 1903 Quit–Claim Deed was recorded in the Georgetown County public records on May 30, 1903.

In 1987, the Diocese amended its constitution and canons so as to include the "Dennis Canon." The Dennis Canon purports to declare a trust, in favor of the ECUSA and the Diocese, on all real and personal property held by any congregation.[4] No such property canons existed in 1902 when the Diocese directed the congregation to incorporate, or when it executed the 1903 Quit–Claim Deed in favor of the newly created All Saints Parish, Waccamaw, Inc.

---

4. Presumably, the Dennis Canon was enacted in reaction to the Supreme Court of the United States's opinion in *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). In *Jones*, the Supreme Court established that the First Amendment did not require a civil court to defer completely to ecclesiastical authorities when adjudicating church disputes.

In August 2000, due to concern over the status of title to its property, the All Saints congregation conducted a formal title examination. The examiner concluded that the 1745 Trust Deed and the 1903 Quit–Claim Deed were the only recorded deeds pertaining to the congregation's property. Soon thereafter, in September 2000, the Diocese recorded a notice in Georgetown County purporting to declare that the congregation held its property, pursuant to the Dennis Canon, in trust for the benefit of the ECUSA and the Diocese ("the 2000 Notice"). Because of the 2000 Notice and the 1745 Trust Deed, the congregation was unable to acquire title insurance.

In October 2000, the congregation, in the name of its corporate entity, All Saints Parish, Waccamaw, Inc., filed a declaratory judgment action against the ECUSA and the Diocese in which it sought an order declaring that the congregation held title to its property or, in the alternative, held its property in trust for the benefit of the inhabitants of the Waccamaw Neck pursuant to the 1745 Trust Deed. The Diocese and the ECUSA answered and counterclaimed asserting that the property was subject to their canons and the 2000 Notice.

By consent order, a guardian *ad litem* was appointed to represent the interests of John and Jane Doe, the unknown heirs of the original trustees to the 1745 Trust Deed, George Pawley and William Poole. The Does and the congregation filed joint motions for summary judgment. The motions were granted and, pursuant to the 1745 Trust Deed, the trial court found that the Does held legal title to the property at issue and that the inhabitants of the Waccamaw Neck held equitable title as beneficiaries to the 1745 Trust Deed. The matter was remanded to the probate court for further fact finding with respect to the identity of the parties to the 1745 Trust Deed.

The ECUSA and Diocese appealed. The court of appeals found that there were genuine issues of material fact concerning whether the trust created by the 1745 Trust Deed failed when the Church of England ceased to be established as the official religion of South Carolina and whether the Statute of Uses operated to execute the trust. Accordingly, the court of appeals remanded the case to the circuit court. *All Saints Parish, Waccamaw v. The Protestant Episcopal Church in the*

*Diocese of South Carolina*, 358 S.C. 209, 595 S.E.2d 253 (Ct.App.2004), cert. denied, July 2005.

In August 2003, prompted by events that are not relevant here, the congregation appointed a committee to recommend whether it should leave the Diocese and the ECUSA. On December 9, 2003 the committee recommended that the corporate charter of All Saints Parish, Waccamaw, Inc. be amended so as to delete references to the canons and rules. of the Diocese and the ECUSA. Specifically, the committee recommended that "Article Fourth"[5] of the 1902 Certificate of Incorporation be amended to read:

The purpose of All Saints Parish, Waccamaw, Inc., also known as All Saints Church, is to create an environment in which all people and especially the inhabitants of the Waccamaw Neck come to know Jesus Christ: to Love Him, to Worship Him, to Learn of Him, to Proclaim Him, and to Minister in His Name.

Furthermore, the committee recommended that the congregation additionally amend its charter so as to affirmatively sever its affiliation with the ECUSA and the Diocese.

On December 17, 2003, after learning of the proposed amendments, Edward L. Salmon, Jr., Bishop of the Diocese, sent a letter to the congregation's wardens and each member of the vestry stating that the congregation's status was reduced from that of a parish to a "mission." In his letter, Bishop Salmon also declared that the members of the congregation's vestry had abandoned their offices.[6]

On December 21, 2003, sixty members of the congregation signed a "Request for Special Congregational Meeting." The purpose of this meeting was to discuss and vote on whether the congregation should take the committee's recommendations and vote to amend its charter so as to change its

5. Prior to the amendment, "Article Fourth" read: ."The purpose of the said proposed Corporation is to conduct Religious services, and prosecute religious works under the forms and according to the canons and rules of the protestant Episcopal Church, and as a component part of the Diocese of said Church in South Carolina."

6. In his letter, Bishop Salmon did not opine as to the status of the congregation's members in so far as it concerned their ability to meet and vote on corporate action.

corporate purpose and sever its affiliation with the ECUSA and the Diocese. Notice of the meeting was sent to the congregation's members on December 23, 2003.

On January 8, 2004, five-hundred and seven of the congregation's members attended the Special Congregational Meeting and more than a two-thirds majority voted to amend the congregation's 1902 Certificate of Incorporation adopting the aforementioned amendment to "Article Fourth." Additionally, more than a two-thirds majority voted to amend the charter so as to withdraw from the Diocese and the ECUSA, but remain part of the Anglican Communion by affiliating themselves with the Episcopal Church of Rwanda and its Anglican Mission in America.[7] Accordingly, the corporate secretary for All Saints Parish, Waccamaw, Inc. prepared and signed the Articles of Amendment to the 1902 Certificate of Incorporation. These Articles of Amendment were filed in the South Carolina Secretary of State's office on January 15, 2004.

On January 9, 2005, a small group of members who remained loyal to the Diocese and the ECUSA met with Bishop Salmon and purported to elect a new vestry for the congregation—the minority vestry. Subsequently, on January 16, 2004, the majority group of members re-elected the vestry removed by the Bishop—the majority vestry.

On January 20, 2005, the minority vestry filed the 2005 Action against the majority vestry alleging that they forfeited office by recommending that the congregation sever its affiliation with the ECUSA and the Diocese. The minority vestry sought a declaration that they were All Saints Parish, Waccamaw, Inc.'s true officers. Additionally, they sought the return of the congregation's real and personal property. The Diocese and Bishop Salmon joined in the action. Subsequently, the trial court consolidated the 2000 Action and the 2005 Action.

The consolidated cases were tried and, after each of the parties presented its case, the trial court decided both underlying actions as a matter of law. With respect to the 2000 Action, the trial court held that, pursuant to the terms of the 1745 Trust Deed, legal title to the real property remained in

---

7. The Anglican Communion is the worldwide body of Episcopal Dioceses. The Episcopal Church of Rwanda is the Rwandan equivalent of the United States' ECUSA.

the unknown Heirs of George Pawley and William Poole, while beneficial title was possessed by the "inhabitants of Waccamaw Neck." [8] As to the 2005 Action, the trial court held that members of the minority vestry were the true officers of All Saints Parish, Waccamaw, Inc. In its original bench order, however, the trial court declined to eject the majority group from the real property because the identity of the parties to the trust created by the 1745 Trust Deed was yet to be determined by the probate court. Nonetheless, upon a motion for reconsideration, the trial court ordered the Secretary of State to cancel the Articles of Amendment filed by the majority group, ejected the majority vestry from the property it occupied which was not granted to the congregation by the 1745 Trust Deed, and restrained the majority vestry from acting as the officers of All Saints Parish, Waccamaw, Inc.

### QUESTIONS PRESENTED

This Court granted certiorari to review the decision of the trial court and the parties raise the following issues for review:

I. Did the trial court err in holding that the trust created by the 1745 Trust Deed remains valid?

II. Did the trial court err in holding that members of minority vestry were the corporate officers of All Saints Parish, Waccamaw, Inc.?

### STANDARD OF REVIEW

 Because the trial court made its ruling on. the 2000 Action pursuant to Rule 39(b), SCRCP, the standard of review with respect to the 2000 Action is the same as that for an action at law tried without a jury. In an action at law tried without a jury, the judge's finding of fact will not be disturbed unless there is no evidence to support the court's finding. *Jowers v. Hornsby*, 292 S.C. 549, 552, 357 S.E.2d 710, 711 (1987).

 The standard of review for the grant of a directed verdict applies to the review of the 2005 Action. When reviewing a denial of a motion for directed verdict, this Court

---

8. The trial court made its ruling on the 2000 Action pursuant to Rule 39(b), SCRCP.

applies the same standard as the trial court. *Gadson ex rel. Gadson v. ECO Services of South Carolina, Inc.*, 374 S.C. 171, 175, 648 S.E.2d 585, 588 (2007). In ruling on a motion for a directed verdict, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motion. *Hurd v. Williamsburg County*, 363 S.C. 421, 426, 611 S.E.2d 488, 491 (2005).

## Law/Analysis

■ In this case, we are called upon to adjudicate two disputes. The 2000 Action is a dispute between a congregation and its denomination over title to church property. The 2005 Action is a dispute among the congregation's members over corporate control. Because church disputes are very often prompted by disagreements over religious doctrine and belief, the civil courts in this country have addressed them carefully, keeping the First Amendment in mind. The decisions of the Supreme Court of the United States concerning church dispute litigation make clear that there is no constitutionally prescribed rule for a civil court's disposition of such matters. Nonetheless, there is a general constitutional command, based in the First Amendment, mandating that civil courts to "decide church ... disputes without resolving underlying controversies over religious doctrine." *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

■ Within the context of this general constitutional command, the Supreme Court of the United States has expressly approved two methods for a civil court's resolution of church disputes. These approaches have become known as the "deference approach" and the "neutral principles of law approach." We hereby explicitly reaffirm that, when resolving church dispute cases, South Carolina courts are to apply the neutral principles of law approach as approved by the Supreme Court of the United States in *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), and expressed by this Court in *Pearson v. Church of God*, 325 S.C. 45, 478 S.E.2d 849 (1996). The following context is necessary for a clear understanding of this rule and its application to the facts presented by this case.

The Supreme Court of the United States first approved the "deference approach" in 1871. *See Watson v. Jones,* 80 U.S. 679, 13 Wall. 679, 20 L.Ed. 666 (1871). Under this approach, a court must only determine whether a church is "congregational" or "hierarchical" in nature.[9] If the church is congregational, the court will resolve the dispute by deferring to a majority of the congregation. However, if the congregation at issue is part of a hierarchical organization, the court will defer to the decision of the ecclesiastical authorities.

Because the deference approach was, for a long time, the only approach explicitly approved as constitutional by the Supreme Court of the United States, this Court has issued a handful of opinions that are consistent with the deference approach. *See Bramlett v. Young,* 229 S.C. 519, 93 S.E.2d 873 (1956) (holding that a minority group of a local, hierarchical Presbyterian church's members were entitled to ownership and control of church property because they were recognized as the true congregation by the hierarchical authorities); *Adickes v. Adkins,* 264 S.C. 394, 215 S.E.2d 442 (1975) (holding that where a majority of a local Presbyterian congregation voted to sever its connection with its hierarchical authorities, the minority faction which the hierarchical authorities recognized as the true congregation was entitled to control of the church properties); *Seldon v. Singletary,* 284 S.C. 148, 326 S.E.2d 147 (1985) (holding that a local church was part of a hierarchical denomination, thus, the minority group of members recognized by the hierarchical authorities were entitled to possession and control of church property). In each of these cases we applied the deference approach and analyzed the issues by determining whether the church at issue was congregational or hierarchical in nature and deferred accordingly. This short analysis disposed of those cases and, in so doing, these decisions complied with the First Amendment's command that "civil courts ... decide church property disputes without resolving underlying controversies over reli-

---

9. "A congregational church is an independent organization, governed solely within itself ..., while a hierarchical [or ecclesiastical] church may be defined as one organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." *Seldon v. Singletary,* 284 S.C. 148, 149, 326 S.E.2d 147, 148 (1985).

gious doctrine." [10] *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) quoting *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).

The deference approach, which the Supreme Court of the United States never explicitly held was the only constitutional method of adjudicating church disputes, is rigid in its application and does not give efficacy to the neutral, civil legal documents and principles with which religious congregations and denominations often organize their affairs. Thus, throughout the country, other approaches to the resolution of church disputes have slowly developed.

In 1979, the Supreme Court of the United States expressly approved the use of a second method of resolving church disputes. In *Jones v. Wolf*, the Supreme Court affirmed a Georgia court's use of the neutral principles of law approach to resolve church disputes. 443 U.S. at 603, 99 S.Ct. 3020 (holding that a state is constitutionally entitled to adopt the neutral principles of law approach as a means of adjudicating church disputes). This method "relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id.* at 603, 99 S.Ct. 3020. Church disputes that are resolved under the neutral principles of law approach do not turn on the single question of whether a church is congregational or hierarchical. Rather, the neutral principles of law approach permits the application of property, corporate, and other forms of law to church disputes.

A clear recitation of the neutral principles of law approach as adopted by this Court was enunciated in *Pearson v. Church of God*. In *Pearson*, we articulated the rule that South Carolina civil courts must follow when adjudicating church dispute cases. We reaffirm and more fully explain this rule here. The *Pearson* rule provides:

---

**10.** This command applies to state courts by way of the Fourteenth Amendment.

(1) Courts may not engage in resolving disputes as to religious law, principle, doctrine, discipline, custom, or administration; (2) courts cannot avoid adjudicating rights growing out of civil law; (3) in resolving such civil law disputes, courts must accept as final and binding the decision of the highest religious judicatories as to religious law, principle, doctrine, discipline, custom, and administration.

325 S.C. at 53, 478 S.E.2d at 854.

■ The *Pearson* rule establishes that where a civil court can completely resolve a church dispute on neutral principles of law, the First Amendment commands it to do so. Nonetheless, where a civil court is presented an issue which is a question of religious law or doctrine masquerading as a dispute over church property or corporate control, it must defer to the decisions of the proper church judicatories in so far as it concerns religious or doctrinal issues. *See Serbian Eastern Orthodox Diocese,* 426 U.S. at 709, 96 S.Ct. 2372 (finding that the controversy before the Court "essentially involve[d] not a church property dispute, but a religious dispute the resolution of which ... is for ecclesiastical and not civil tribunals.").

It is with the *Pearson* rule in mind that we now turn to the two issues before us in this appeal. We remain mindful of the First Amendment and its protections of religious liberty. Nonetheless, adjudication of this matter does not require us to wade into the waters of religious law, doctrine, or polity. We find that the Diocese and ECUSA organized their affairs with All Saints Parish in a manner that makes the complete resolution of the questions presented achievable through the application of neutral principles of property, trust, and corporate law.

## I. Property Ownership

Turning to the 2000 Action, the trial court held that the trust created by the 1745 Trust Deed remained valid and that legal title is held by the unknown heirs of George Pawley and William Poole while the beneficial title is held by the "Inhabitants of Waccamaw Neck." We disagree.

Based upon an application of the relevant neutral principles of law, we hold that the trial court erred in determining that the trust created by the 1745 Trust Deed remains valid.

Further, we hold that this trust was executed by the Statute of Uses and that title to the property is held by the congregational corporate entity—All Saints Parish, Waccamaw, Inc.

### A. The Statute of Uses

It is well established that "where there is a conveyance to one for the use of another, and the trustee is charged with no duty which renders it necessary that the legal estate should remain in him to enable him properly to perform such duty, the Statute of Uses executes the use and carries the legal title to the [beneficial] use." *Faber v. Police*, 10 S.C. 376, 389–90 (1877).[11] Further, in a trust where the trustees have no duties, "the legal and equitable titles are merged in the beneficiaries and the beneficial use is converted into legal ownership." *Johnson v. Thornton*, 264 S.C. 252, 257, 214 S.E.2d 124, 127 (1975). Nonetheless, the Statute of Uses will not operate to execute a trust where there is no beneficiary capable of taking legal title. *See Bowen v. Humphreys*, 24 S.C. 452, 455 (1886) (holding that the Statute of Uses cannot execute a trust where there is no identifiable beneficiary capable of holding title).

Therefore, there are two questions that must be asked in order to determine if the trust created by the 1745 Trust Deed was executed by the Statute of Uses: (1) whether the trustees had any duties relative to their office, and (2) whether there is a beneficiary capable of taking title. We hold that the trustees of this trust did not have any duties relative to their office and that the congregation of All Saints Parish was the intended beneficiary and, upon its formation, was clearly capable of taking title.

### 1. Trustees' Duties

We hold that the 1745 Trust Deed did not impose any duties upon the trustees, George Pawley and William Poole. Pawley and Poole were colonial appointees given the authority to accept conveyances of land for the purpose of establishing

---

11. England enacted the Statute of Uses during the reign of Henry VIII. 27 Henry VIII ch. 10 (1535). It was adopted by the South Carolina Commons House of Assembly in 1712. Act No. 322, 2 S.C. 401 (1712) at 466.

parishes. When named trustees to the 1745 Trust Deed, they were acting as appointees of the colony, not as trustees with traditional duties. This conclusion is supported by the relevant legal realities of that time. The court of appeals in *All Saints* correctly stated that "in colonial times, churches could not be recognized by the government until they owned property, and they could not own property until they had been officially recognized." *All Saints*, 358 S.C. at 225, 595 S.E.2d at 262. "As such, a colonial practice arose in which a settlor placed property in trust for a congregation until such a time as the government recognized the church." *Id.* (citing *Town of Pawlet v. Clark*, 9 U.S.(Cranch) 292, 330, 3 L.Ed. 735 (1815) (holding "no parish church ... could have legal existence until consecration and consecration was expressly inhibited unless a suitable endowment of land.")). Pawley and Poole did not have any duties relative to the trust, but simply acted as custodians of the property at issue until All Saints Parish was officially established. This conclusion is supported by language of the 1745 Trust Deed which did not expressly impose any duties upon them, nor is there any evidence in the record which suggests that either of the trustees performed any acts relative to their office as trustee.

Further, Percival and Ann Pawley were not traditional settlors of a trust. Rather, they sold the property at a price far above nominal value. They were clearly sellers of property to colonially appointed commissioners for the establishment of a parish, purposes specified by the colonial government.

## 2. Beneficiary Capable of Taking Title

Holding that the trustees to the 1745 Trust Deed had no duties, we now analyze whether there was a beneficiary capable of taking title. According to the terms of the 1745 Trust Deed, the beneficiaries were "the Inhabitants of Waccamaw Neck." This term is ambiguous and parol evidence should be used to ascertain its meaning. *See Shelley v. Shelley*, 244 S.C. 598, 606, 137 S.E.2d 851, 855 (1964)(holding that parol evidence is admissible so long as its admission is merely intended to explain and apply what the settlor has written).

Based on the following application of parol evidence, we hold that the term "Inhabitants of Waccamaw Neck" was used by the settlors of the trust as an expression referring to the

yet-to-be-created All Saints Parish. Early South Carolina colonial statutes used the term "inhabitants" when referring to the colony's parishes. For instance, The Church Act of 1706 contains multiple uses of the term "inhabitants" referring to parishes. *See* Act No. 256 at §§ 7, 10, 12, 13, 19, 21, 22, 29, 30, 35, 2 S.C. Stat. 284–89 (1706). Additionally, this understanding of the term is supported by the historical context in which the 1745 Trust Deed was executed. In 1745, the inhabitants of Waccamaw Neck were parishioners of Prince George's Parish. They were clamoring for the establishment of their own Parish congregation and had already been worshipping on the land at issue for approximately eight years. It was within this historical context that the 1745 Trust Deed was executed in expectation that the subject property would be for the benefit of the yet-to-be formed All Saints Parish.

Additionally, according to the express terms of the original Church Act of 1706, a colonial Parish could hold title to land. The Act specifically empowered commissioners "to take up by grant from the Lords Proprietors, or purchase the same for them, or any other person, and have, taken and receive so much land as they think necessary for the several sites of the several churches." Act No. 256 at § 8, 2 S.C. Stat. 284. Thus, when the Church Act of 1767 formed All Saints Parish, the Statute of Uses operated to execute the trust created by the 1745 Trust Deed and title vested in the intended beneficiary, the congregation of All Saints Parish.

### B. 1903 Quit–Claim Deed

■ Moreover, the 1903 Quit–Claim Deed makes clear that All Saints Parish, Waccamaw, Inc. holds title to its property. The All Saints Parish congregation was officially incorporated in 1820. In 1902, due to doubt over the status of the congregation's incorporation, the Diocese directed it to re-incorporate as "All Saints Parish, Waccamaw, Inc." Shortly thereafter, in order to settle any doubt as to the status of title to Parish property, the Diocese voluntarily executed the 1903 Quit–Claim deed. The 1903 Quit–Claim Deed makes clear that title to the property at issue is currently held by the congregation's corporate entity—All Saints Parish, Waccamaw, Inc.

### C. 2000 Notice and Dennis Canon

Furthermore, we hold that neither the 2000 Notice nor the Dennis Canon has any legal effect on title to the All Saints congregation's property. A trust "may be created by either declaration of trust or by transfer of property...." *Dreher v. Dreher*, 370 S.C. 75, 80, 634 S.E.2d 646, 648 (2006). It is an axiomatic principle of law that a person or entity must hold title to property in order to declare that it is held in trust for the benefit of another or transfer legal title to one person for the benefit of another. The Diocese did not, at the time it recorded the 2000 Notice, have any interest in the congregation's property. Therefore, the recordation of the 2000 Notice could not have created a trust over the property.

For the aforementioned reasons, we hold that title to the property at issue is held by All Saints Parish, Waccamaw, Inc., the Dennis Canons had no legal effect on the title to the congregation's property, and the 2000 Notice should be removed from the Georgetown County records.

### II. Corporate Control

Turning to the 2005 Action, we find that the trial court applied the deference approach, determined that the congregation was part of a hierarchical organization, and deferred to the Diocese's ecclesiastical authority's determination that members of the minority vestry were the true officers of All Saints Parish, Waccamaw, Inc. We disagree.

While it is true that "[c]ourts may not engage in resolving disputes as to religious law, principle, doctrine, discipline, custom, or administration," *Pearson*, 325 S.C. at 53, 478 S.E.2d at 854, the resolution of the 2005 Action does not require such judicial meddling. The 2005 case turns on a determination of whether the Articles of Amendment approved by the members of All Saints Waccamaw, Inc. on January 8, 2004 were adopted in compliance with the South Carolina Non–Profit Act. *See* S.C.Code Ann. § 33–31–1001, et. seq. We find that the Articles of Amendment were lawfully adopted and effectively severed the corporation's legal ties to the ECUSA and the Diocese. Therefore, we find that the members of the majority vestry are the true officers of All Saints Parish, Waccamaw, Inc.

Pursuant to the South Carolina Non–Profit Act, a religious corporation may amend its Articles of Incorporation to add or change a provision permitted in the articles or delete a provision not required in the articles. S.C.Code Ann. § 33–31–1001. Amendment to a corporation's articles, to be adopted, must be approved by (1) the board of directors, (2) the members "by two-thirds of the votes cast or a majority of the voting power, whichever is less," and (3) any person whose approval is required by the Articles of Incorporation. S.C.Code Ann. § 33–31–1003(a)(1–3). The passage of the Articles of Amendment approved by the congregation on January 8, 2004 complied with all three of these requirements.

First, the Articles of Amendment were approved by the board of directors. On December 8, 2003, while still in good standing with the Diocese, the majority vestry, acting as the corporation's board of directors, approved the Articles of Amendment at issue here. Thus, the passage of the Articles of Amendment met the requirements of S.C.Code Ann. § 33–31–1003(a)(1).

Second, the Articles of Amendment were approved by the members of All Saints Parish, Waccamaw, Inc. by two-thirds of the votes cast. Five hundred and seven members of All Saints Parish, Waccamaw, Inc. were present at the January 8, 2004 meeting which was called to discuss and vote upon the Articles of Amendment. Of the five hundred and seven members present, four hundred and sixty-four votes were cast in favor of amending the Articles of Incorporation. Therefore, more than nine-tenths of the votes cast were in favor of the amendments, clearly more than the two-thirds statutorily required. There is no evidence in the record to suggest that the members present and voting were not in good standing at the time of the vote. Thus, the passage of the Articles of Amendment clearly met the requirements of S.C.Code Ann. § 33–31–1003(a)(2).

Finally, nothing in the All Saints Parish, Waccamaw, Inc. by-laws or the Constitutions and Canons of the ECUSA or Diocese requires third-party approval for amendments to the congregation's corporate charter, therefore the congregation's adoption of the Articles of Amendment complied with the requirements of S.C.Code Ann. § 33–31–1003(a)(3). The stat-

utory provisions pertaining to a religious corporation's amendment of its corporate charter were amended in 1994 so as to add the option of third-party approval. *See* 1994 S.C. Acts 384. There is no evidence in the record that, since that time, the Diocese has ever attempted to gain approval power over amendments to the All Saints Parish, Waccamaw, Inc. corporate charter.

The facts presented by this case demonstrate that the congregation, in compliance with relevant statutory provisions and applicable bylaws, passed the Articles of Amendment, thus removing any reference to the ECUSA and Diocese and explicitly severing any legal relationship with those organizations. Therefore, through the application of neutral principles of law, it is clear to us that the true officers of All Saints Parish, Waccamaw, Inc. are the members of the majority vestry.

### CONCLUSION

For the foregoing reasons, we reverse the trial court's decision with respect to both the 2000 Action and the 2005 Action.

WALLER, BEATTY, JJ., Acting Justice JAMES E. MOORE and Acting Justice PERRY M. BUCKNER, concur.